801 A.2d 1142

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. ROBERT O. MARSHALL, DEFENDANT–
APPELLANT.

Argued January 29, 2002—Decided July 30, 2002.

344

*Stephen W. Kirsch,* Assistant Deputy Public Defender, argued the cause for appellant (*Peter A. Garcia,* Acting Public Defender, attorney).

*Robert E. Bonpietro,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Acting Attorney General, attorney).

The opinion of the Court was delivered by

PORITZ, C.J.

Defendant, Robert Marshall, was convicted for conspiracy to commit the murder of his wife, Maria Marshall, and for murder as an accomplice who arranged for the murder-by-hire of Maria Marshall. Following a separate sentencing proceeding, the trial court sentenced defendant to death, as required by the jury's verdict.

In this second petition for post-conviction relief (PCR), defendant challenges the sentencing portion of his trial and seeks reversal of his death sentence on the ground that the trial court

delivered erroneous instructions to the jury. The PCR court dismissed defendant's second PCR petition as procedurally barred, finding that the claim raised in the petition was adjudicated by this Court when it considered defendant's first PCR petition, *State v. Marshall*, 148 *N.J.* 89, 690 *A.2d* 1 (1997) (*Marshall III*). The court also indicated that defendant filed his second PCR petition beyond the five-year time limit but did not dismiss the petition on that ground.

We affirm the trial court's dismissal of defendant's petition. We find that the New Jersey Court Rules (Rules) preclude consideration of defendant's second PCR petition because it is both procedurally barred and time barred. *R.* 3:22-5; *R.* 3:22-12. Regardless of those bars, we observe that defendant's claim does not warrant relief for the reason that the trial court's penalty-phase instructions properly informed the jury of its sentencing options.

## I

Defendant was charged in Ocean County Indictment 26-1-85 with the crimes of conspiracy to commit murder, in violation of *N.J.S.A.* 2C:5-2, and capital murder as an accomplice who procured the commission of the murder by payment or promise of payment, in violation of *N.J.S.A.* 2C:11-3a(1) or (2). Following a venue change, trial was held in Atlantic County from January 14, 1986 through March 5, 1986. On March 5, 1986, defendant was convicted on both counts.

Our first *Marshall* opinion contains a detailed account of the evidence adduced at defendant's trial. *See State v. Marshall*, 123 *N.J.* 1, 586 *A.2d* 85 (1991) (*Marshall I*), *cert. denied*, 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.2d* 694 (1993). We reproduce here a summary of the facts the jury could have found, excerpted from *State v. Marshall*, 130 *N.J.* 109, 613 *A.2d* 1059 (1992) (*Marshall II*), *cert. denied*, 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.2d* 694 (1993), and also reproduced in *Marshall III, supra*.

Defendant, a Toms River insurance agent, began an extramarital affair with Sarann Kraushaar, a married woman, in June 1983. As early as December 1983, defendant mentioned to Kraushaar the idea of killing his wife, Maria. In May 1984, defendant met Robert Cumber of Louisiana and questioned him about hiring an "investigator." Defendant later telephoned Cumber, who referred defendant to Billy Wayne McKinnon, a former sheriff's officer from Louisiana. Defendant agreed to pay McKinnon $5,000 to meet him in Atlantic City, New Jersey.

Defendant met McKinnon at Harrah's Casino in Atlantic City on June 18, 1984, and offered to pay him $65,000 to kill his wife. In addition to the $5,000 that McKinnon had already received, defendant agreed to pay him $10,000 up front and $50,000 from the expected insurance proceeds on his wife's life. At that meeting defendant paid McKinnon $7,000 and gave him a picture of his wife. Defendant told McKinnon to kill her that evening, when defendant would be present. In preparation for the killing, defendant and McKinnon discussed various ways to kill Maria. Defendant believed that he would not be considered a suspect because he was considered an outstanding citizen with influence in the community.

McKinnon did not carry out the murder at that time, but instead returned to Louisiana. Defendant communicated with him on numerous occasions and sent him additional money. Under pressure from defendant to complete the job, McKinnon returned to Atlantic City on July 19, 1984, and met with defendant, who proposed a second plan for the killing to take place that evening. Defendant told McKinnon that he would leave his wife in their car to be executed while defendant went into a restaurant under the pretense of using the bathroom facilities. However, McKinnon did not commit the murder at that time either. Defendant, persistent in his efforts to have his wife killed, offered McKinnon an "extra fifteen" ($15,000) if he would return to New Jersey a third time to do the "job" before Labor Day. McKinnon agreed, and, on September 6, 1984, he and defendant met at a service area parking lot located south of Toms River. Together they selected a spot on the Garden State Parkway to carry out Maria's murder and made final plans for the slaying, which was to occur that evening. The plan was to make the murder look like a robbery.

Defendant took his wife to Harrah's Casino in Atlantic City on the night of September 6, 1984, under the pretext of an evening of dining and gambling. He met McKinnon outside Harrah's at approximately 9:30 p.m. and told him that he and Maria would be leaving the casino at about midnight. Defendant also asked McKinnon for the return of the photographs of Maria and of their home that he had given him in June. As previously arranged with McKinnon, defendant pulled into the Oyster Creek picnic area at milepost seventy-one on the Garden State Parkway at about 12:30 a.m. on September 7. While his wife lay sleeping on the front seat, defendant got out of the car under the ruse of needing to repair a flat tire. Defendant squatted down to prepare himself for being hit on the head as part of the simulated robbery. Maria Marshall was shot in the back twice. She died immediately.

When the police arrived on the scene, defendant continued to make the murder look like a robbery. The State argues that defendant showed no remorse after the crime, but pretended to join his three sons in grieving over the loss of their mother.

The State argued at the trial level that he even staged a suicide attempt. Defendant protested his innocence then and continues to do so now in explanation of his conduct. Defendant's claims of innocence soon unraveled. Telephone records traced him to McKinnon, who turned State's evidence. In exchange for a plea to conspiracy to commit murder, McKinnon implicated Marshall and identified a Louisiana man, Larry Thompson, as the triggerman.

Investigation disclosed that during his planning, defendant had been increasing the insurance policies on his wife's life. At the time of her death, Maria Marshall's life was insured for about $1,400,000. Defendant had been paying his wife's premiums while neglecting his own. Defendant hastened to complete an application for a policy for a home mortgage before the murder. On the last day of her life, Maria underwent a physical examination for that policy. The State offered proof that defendant could have been motivated to kill by rising debts incurred in his business, including a $128,000 home-equity loan and a short-term bank debt in excess of $40,000. While amassing those large insurance policies, defendant also continued his relationship with Sarann Kraushaar, with whom he had intended to live after the murder.

A jury acquitted Thompson of the murder but accepted McKinnon's version of defendant's role and found him guilty of conspiracy to commit his wife's murder and of murder-by-hire. The only aggravating factor submitted to and found by the jury was that defendant had hired another to commit murder. *N.J.S.A.* 2C:11–3c(4)(e). The two mitigating factors submitted to and found by the jury were that defendant had no history of criminal activity, [*N.J.S.A.* 2C:11–3]c(5)(f), and the catch-all mitigating factor, [*N.J.S.A.* 2C:11–3]c(5)(h). At the time of the offense defendant was forty-four years of age, and had been involved in charitable and community activities. The jury unanimously found beyond a reasonable doubt that the aggravating factor outweighed the mitigating factors. The trial court sentenced defendant to death.

[*Marshall III, supra*, 148 *N.J.* at 137–38, 690 *A.*2d 1; *Marshall II, supra*, 130 *N.J.* at 121–24, 613 *A.*2d 1059.]

After defendant was convicted of capital murder in the guilt phase of his trial, a separate sentencing trial was held. See *N.J.S.A.* 2C:11–3c(1). At the inception of the sentencing phase, defense counsel indicated that it was defendant's decision, with which counsel concurred, to call no witnesses during the sentencing proceeding. The State also offered no additional evidence, and therefore each side argued its case in closing arguments.

The State presented one aggravating factor at the sentencing phase, that defendant "procured the commission of the offense by payment or promise of payment of anything of pecuniary value," *N.J.S.A.* 2C:11–3c(4)(e), and relied on the proofs from the guilt phase of the trial to establish beyond a reasonable doubt that

defendant had paid money to hire others to kill his wife. The defense presented two mitigating factors: (1) that Marshall had no history of criminal activity, *N.J.S.A.* 2C:11–3c(5)(f); and (2) the catch-all mitigating factor, *i.e.,* "[a]ny other factor relevant to the defendant's character or record or to the circumstances of the offense," *N.J.S.A.* 2C:11–3c(5)(h). Both sides stipulated that defendant had no history of prior criminal activity. Although no additional evidence was presented in support of the catch-all mitigating factor, in his summation defense counsel argued that the evidence concerning Marshall's business, charitable, and community activities, which had been put before the jury in the guilt-phase trial, established that mitigating factor.

The jury unanimously found the existence of the aggravating factor and also found evidence to support both mitigating factors. It concluded unanimously that the single aggravating factor outweighed the mitigating factors beyond a reasonable doubt. Accordingly, the trial court sentenced defendant to death.

We upheld Marshall's conviction and death sentence on direct review, *Marshall I, supra,* 123 *N.J.* at 208, 586 *A.2d* 85, and affirmed the proportionality of his death sentence, *Marshall II, supra,* 130 *N.J.* at 221, 613 *A.2d* 1059. Defendant filed his first PCR petition with the Law Division, Atlantic County, on April 11, 1991. On February 8, 1995, the trial court issued an order denying the petition, and we affirmed the denial of relief on March 5, 1997. *Marshall III, supra,* 148 *N.J.* at 286, 690 *A.2d* 1.[1]

On February 9, 2001, defendant filed a second PCR petition with the Law Division, Atlantic County. The State filed a Motion to Dismiss the second petition, arguing that it was time barred by *Rule* 3:22–12 and procedurally barred by *Rule* 3:22–5. The trial

---

[1] Defendant filed a federal *habeas corpus* petition in the United States District Court for the District of New Jersey on November 3, 1997. The District Court denied the petition and, also, denied a certificate of appealability. *Marshall v. Hendricks,* 103 *F.Supp.*2d 749 (D.N.J.2000). The United States Court of Appeals for the Third Circuit reversed on the certificate of appealability. Defendant's *habeas corpus* appeal is currently pending in the Third Circuit.

court heard oral arguments on the Motion to Dismiss on June 21, 2001 and subsequently issued an opinion granting the State's motion. Marshall filed a notice of appeal to this Court on July 19, 2001.

## II

The trial court, on motion by the State, dismissed defendant's second PCR petition as procedurally barred under *Rule* 3:22–5. The trial court observed that the petition also was filed beyond the time limit imposed by *Rule* 3:22–12, but did not rely upon the time bar when it dismissed the petition. Before us, defendant argues that the procedural bar was applied inappropriately to his second PCR petition and that the time bar should be waived. The State contends that both the time bar and the procedural bar preclude consideration of defendant's second PCR petition.

## A

█ The New Jersey Court Rules establish the framework for the filing and disposition of PCR petitions. The trial court relied on *Rule* 3:22–5 to dismiss defendant's second PCR petition. Under that rule, a petitioner cannot assert as a basis for relief a claim previously adjudicated on the merits:

> A prior adjudication upon the merits of any ground for relief is conclusive whether made in the proceedings resulting in the conviction or in any post-conviction proceeding brought pursuant to this rule or prior to the adoption thereof, or in any appeal taken from such proceedings.
>
> [*R.* 3:22–5.]

The trial court found that defendant's claim in his second PCR petition was the same as a claim raised in his first PCR petition, namely, claim F.18. The court determined that this Court adjudicated F.18 in *Marshall III,* which denied defendant's first PCR petition and upheld his death sentence. 148 *N.J.* at 257, 690 *A.*2d 1. Because F.18 so lacked merit that it failed to warrant discussion in our *Marshall III* opinion, the court concluded that we had previously considered the challenged instruction and dismissed defendant's PCR petition.

We addressed the standard for application of *Rule* 3:22–5 in *Marshall III*:

Preclusion of consideration of an argument presented in post-conviction relief proceedings should be effected only if the issue raised is identical or substantially equivalent to that adjudicated previously on direct appeal.

[148 *N.J.* at 150, 690 *A*.2d 1 (quoting *State v. Bontempo,* 170 *N.J.Super.* 220, 234, 406 *A*.2d 203 (Law Div.1979)).]

In order to decide whether *Rule* 3:22–5 bars consideration of defendant's second PCR petition, we must determine whether the instant claim and claim F.18 from his first petition are either identical or "substantially equivalent." If the claims are substantially the same, the petition is procedurally barred; if not, the claim of error should be adjudicated when there is no other reason to bar it.

Defendant's first PCR petition argued over 500 claims of error. Point F.18 was one of several alleging errors in the trial court's charge to the jury at the sentencing phase:

The defendant was denied his right to fundamental fairness, due process and his right to a fair and reliable penalty trial, and was subjected to cruel and unusual punishment, in violation of Article I, Paragraphs 1, 10, and 12 of the New Jersey Constitution, and the Sixth, Eighth and Fourteenth Amendments to the United States constitution, in that the trial court's penalty phase instructions inadequately explained that a non-unanimous verdict was acceptable.

In his appellate brief for his first PCR petition defendant again alleged that "[t]he trial court's penalty phase instructions inadequately explained that a non-unanimous verdict was acceptable." In this PCR petition defendant argues that the penalty-phase jury charge, while nominally informing the jury of the option of non-unanimity, "left the jury far less free to return a non-unanimous verdict than a unanimous one."

In *State v. Ramseur,* 106 *N.J.* 123, 312, 524 *A*.2d 188 (1987), we held that this Court's decision in *State v. Czachor,* 82 *N.J.* 392, 413 *A*.2d 593 (1980), required that "juries in capital cases be informed of, and free to exercise, their statutory option to return a final, non-unanimous verdict resulting in imprisonment if, after a reasonable period of deliberations, they are unable to agree." Defendant converts the *Ramseur* holding into a two-pronged require-

ment that the jury be (1) informed of the option of a non-unanimous verdict and (2) free to exercise that option. He argues that claim F.18 from his first PCR petition and the within claim each address only one prong of the requirement. We reject his contention that the first PCR petition raised a separate and distinct claim from that raised in the second PCR petition.

The Court's concern in *Ramseur* was that "coercive supplemental instructions ... to a jury that has expressed its inability to agree" would improperly influence the members to return a unanimous verdict. 106 *N.J.* at 313, 524 *A.2d* 188. In that case the jury had informed the trial court after a period of deliberations that it was unable to reach unanimity. The court responded with "three separate supplemental charges that did not remind the jury of the option of a final non-unanimous verdict" but rather "stressed the importance of reaching a unanimous verdict." *State v. Hunt,* 115 *N.J.* 330, 382, 558 *A.2d* 1259 (1989) (discussing the jury charge in *Ramseur* ). In *Hunt,* the trial court concluded its charge to the jury by telling the members that they should "try to reach an agreement." *Ibid.* In addition, despite communications from the jury suggesting concerns about a lack of unanimity, the court failed to "remind the jury that it could fulfill its obligations by returning a final non-unanimous verdict." *Ibid.*

▪ Jurors in a capital sentencing trial must be instructed that non-unanimity is an option. *N.J.S.A.* 2C:11–3(f); *Hunt, supra,* 115 *N.J.* at 385, 558 *A.2d* 1259; *State v. Bey,* 112 *N.J.* 123, 179–80, 548 *A.2d* 887 (1988); *Ramseur, supra,* 106 *N.J.* at 312, 524 *A.2d* 188. Further, the instructions at sentencing must convey that non-unanimity is as acceptable a verdict as unanimity and that there is no preference for unanimity over non-unanimity. See *Hunt, supra,* 115 *N.J.* at 383–85, 558 *A.2d* 1259. It is most important that the option of non-unanimity be made clear to the jurors because the Rules governing deliberations at sentencing differ from those governing the guilt-phase deliberations immediately preceding the sentencing phase. There, non-unanimity would result in a mistrial.

The issue to be determined in this case is whether F.18 and the instant petition argue distinct aspects of the *Ramseur* requirement, or whether they both assert the same claim—that the jury instructions failed to satisfy *Ramseur* and thereby denied defendant his constitutional rights. Implicit in the claim that the jury was not informed of the option of non-unanimity is that the jury was therefore not free to exercise that option—the second requirement flows directly from the first. We find therefore that F.18 presented the same argument that Marshall presents here.

Moreover, this Court adjudicated claim F.18 in *Marshall III*, 148 *N.J.* at 257, 690 *A.*2d 1. Our opinion in *Marshall III* exhaustively reviewed many of the 500 grounds for reversal raised by defendant at the same time that we summarily rejected without discussion many others that lacked merit. F.18 fell into the latter group of claims. For that reason, defendant is precluded from raising the claim of error alleged in this petition. The PCR trial court correctly granted the State's motion to dismiss, and we affirm.

## B

■ Our finding that the procedural bar of *Rule* 3:22–5 precludes consideration of defendant's petition is dispositive. Nevertheless, our supervisory function in respect of death penalty cases impels us to provide guidance for those future cases in which the procedural bar does not apply. We will therefore address the impact of the time constraints imposed by *Rule* 3:22–12 on defendant's second PCR petition. The rule provides:

A petition to correct an illegal sentence may be filed at any time. No other petition shall be filed pursuant to this rule more than 5 years after rendition of the judgment or sentence sought to be attacked unless it alleges facts showing that the delay beyond said time was due to defendant's excusable neglect.

[*R.* 3:22–12.]

Defendant filed his second PCR petition well beyond the five-year time limit of *Rule* 3:22–12. Although the parties disagree about the extent of defendant's tardiness, no one disputes that his second PCR petition was late. At issue here is whether the time

bar should apply to defendant's second PCR petition, thus precluding consideration of the merits of his claim.

The importance of striking a balance between the competing interests of finality of judgments and fundamental fairness has been repeatedly emphasized by this Court. *State v. Preciose*, 129 *N.J.* 451, 474–76, 609 *A.*2d 1280 (1992); *State v. Mitchell*, 126 *N.J.* 565, 578–79, 601 *A.*2d 198 (1992); *see also R.* 1:1–2 (stating that a procedural rule "may be relaxed or dispensed with by the court ... if adherence to it would result in an injustice"). In searching for that balance, we have stressed that procedural rules "are not an end unto themselves, but a means of serving the ends of justice." *Preciose, supra,* 129 *N.J.* at 474, 609 *A.*2d 1280 (quoting *Viviano v. CBS,* 101 *N.J.* 538, 550–51, 503 *A.*2d 296 (1986)). *Rule* 3:22–12 is designed to serve the ends of justice. As we observed in *Mitchell,* "good reasons" exist to abide by its strictures:

> As time passes after conviction, the difficulties associated with a fair and accurate reassessment of the critical events multiply. Achieving "justice" years after the fact may be more an illusory temptation than a plausibly attainable goal when memories have dimmed, witnesses have died or disappeared, and evidence is lost or unattainable. Those difficulties have not gone unnoticed by our courts.
>
> ...
>
> Moreover, the Rule serves to respect the need for achieving finality of judgments and to allay the uncertainty associated with an unlimited possibility of relitigation. The Rule therefore strongly encourages those believing they have grounds for postconviction relief to bring their claims swiftly, and discourages them from sitting on their rights until it is too late for a court to render justice.
>
> [126 *N.J.* at 575–76, 601 *A.*2d 198.]

In the absence of facts demonstrating excusable neglect to justify a delay, PCR petitions must be filed within five years of the judgment or sentence. *R.* 3:22–12. The only broad exception to the *Rule* exempts petitions that challenge the legality of a sentence from any time limitation. *Mitchell, supra,* 126 *N.J.* at 576, 601 *A.*2d 198; *R.* 3:22–12.[2]

---

[2] Defendant does not claim that he received an illegal sentence, nor could he make such a claim. The New Jersey Code of Criminal Justice, *N.J.S.A.* 2C:1–1 to 2C:104–9, does not define the term "illegal sentence," but it does specify the penalty for each offense it enumerates. *N.J.S.A.* 2C:43–2; *State v. Murray,* 162

Defendant does not present a case of excusable neglect. His explanation for the tardiness of his second PCR petition—that his previous counsel failed to raise the issue in the first PCR petition—is not correct, and therefore cannot justify relief from the time bar. As discussed above, defendant's previous counsel filed an extensive PCR petition that included, among many other claims, claims of error in respect of the jury charge at the sentencing phase. More specifically, counsel raised the very issue defendant now raises in relation to the trial court's unanimity charge in defendant's PCR petition. There simply is no basis for a claim now of excusable neglect.

## III

Defendant's claim of error in the penalty-phase jury charge is barred because it was considered and rejected in his first PCR petition and because it is now time barred. For purposes of completeness, and to further explain the law in this area, we will briefly address the merits of defendant's claim.

## A

We begin with the principle that a reviewing court must evaluate any alleged error in a portion of a jury charge in the context of the entire charge. *State v. Simon,* 161 *N.J.* 416, 477, 737 *A.*2d 1 (1999); *State v. Harris,* 156 *N.J.* 122, 195, 716 *A.*2d 458 (1998). Also, a reviewing court must assume that the jury followed the instructions delivered by the trial court. *State v. Manley,* 54 *N.J.* 259, 271, 255 *A.*2d 193 (1969). In order to

---

*N.J.* 240, 246, 744 *A.*2d 131 (2000). Under our Rules, a PCR petition is cognizable if it is based on the "imposition of [a] sentence in excess of or otherwise not in accordance with the sentence authorized by law." *R.* 3:22–2(c); *see Murray, supra,* 162 *N.J.* at 246, 744 *A.*2d 131. Under our case law, the "illegal sentence" standard has been applied to only two types of sentences-sentences that exceed the penalty authorized by statute for the specific offense and sentences not imposed in accordance with the law. *Murray, supra,* 162 *N.J.* at 246–47, 744 *A.*2d 131.

evaluate defendant's claim, then, we reproduce here in its entirety the trial court's instructions to the jury at defendant's sentencing-phase trial.

Ladies and gentlemen, now you have to decide whether or not the defendant is to be sentenced to death. Quite obviously, your ultimate decision in that regard is extremely important, both from the perspective of the State of New Jersey and from the viewpoint of the defendant.

I fully understand the significance of the difficulty with respect to the task that you will be called upon to undertake. Nevertheless, I am confident that you will be equal to your oath.

The sentence will be determined by your findings concerning specific aggravating and mitigating factors which are listed in our law. The defendant must be sentenced to death if you are satisfied beyond a reasonable doubt that an aggravating factor exists and that such aggravating factor, as you find to exist beyond a reasonable doubt, outweighs all mitigating factors.

I have previously defined for you the term reasonable doubt, and I'll just instruct you again briefly with respect to that concept.

A reasonable doubt is not a mere possible or imaginary doubt, because as you may well know, everything relating to human affairs or depending upon oral evidence is open to some possible or imaginary doubt. A reasonable doubt is an honest and reasonable uncertainty as to the existence of a fact which is present in your mind after you have given full and impartial consideration to all of the evidence. It may arise from the evidence itself or from a lack of evidence.

For the purpose of this case, you may consider only what—as to aggravating factors, whether the following aggravating factor has been proven beyond a reasonable doubt; that is, that the defendant procured the commission of the offense by payment or promise of payment of anything of value.

The evidence at the trial, which is relevant to the aggravating and mitigating factors, shall be considered by you without the necessity of re-introducing that evidence at this proceeding.

The State has the burden of convincing you beyond a reasonable doubt that the aggravating factor has been proven. If you're not so convinced, the defendant will not receive the death penalty, but will be sentenced by the Court to a term of imprisonment, which I will mention to you shortly.

With respect to mitigating factors, you do not have to be convinced of their existence. That is to say, the defendant doesn't have the burden of establishing the mitigating factors. If any evidence has been presented with respect to mitigating factors, then you are bound by the law to consider it and weigh it against any aggravating factor that you have found present.

Of course, with respect to both aggravating and mitigating factors, you are the sole judges of the truth of the evidence presented. Should you find that this aggravating factor alleged has been proven and that evidence of at least one mitigating factor is present, you must then weigh the aggravating and the mitigating factors, and the defendant will be sentenced to death only if you are convinced beyond a

reasonable doubt that the aggravating exists and outweighs the mitigating factors, and all of the mitigating factors, beyond a reasonable doubt.

If you reach the point in your deliberations where you're weighing aggravating and mitigating factors, it's important for you to understand that this is not a mechanical process. It doesn't necessarily or simply depend upon the number of factors on each side. It does depend on your careful and considered judgment as to whether or not the aggravating factor is of such gravity, seriousness, or weight, that, beyond a reasonable doubt, it outweighs all of the evidence as to mitigating factors.

If you are convinced beyond a reasonable doubt that the aggravating factor or factors outweigh—aggravating factor, I should say, since there's only one alleged—outweighs all mitigating factors, then the defendant will be sentenced to death by virtue of your verdict. If you are not convinced beyond a reasonable doubt of the existence of an aggravating factor or not convinced beyond a reasonable doubt that any aggravating factor which exists outweighs all mitigating factors, then the defendant will be sentenced to a term of imprisonment for a period of thirty years to life, with no parole possible for at least thirty years.

Your verdict must be unanimous. You must all agree as to the existence or nonexistence or the alleged aggravating factor.

However, as to mitigating factors, if any one or more of you find such exists, you should check yes as to that mitigating factor on the verdict sheet that you receive. If, after careful, conscientious and thorough deliberations, you're unable to agree upon your finding and your verdict, then you should report that to me. If in my opinion, further deliberations will not result in a unanimous agreement on the verdict, then I will impose the appropriate penalty, which will be the sentence of imprisonment to which I just referred.

I don't want to place any greater burden upon you than exists by virtue of the law. You have a difficult task. However, you accepted this responsibility as public citizens pursuant to the oath that was administered to you. There's nothing peculiarly different than the way a jury is to consider proof in any criminal case or any criminal proceeding from that in which all reasonable persons treat any questions, depending upon evidence presented to them.

You're expected to use your good sense, consider the evidence for only the purpose for which it has been admitted, and give it a fair and reasonable construction in the light of your common knowledge of the natural tendencies and inclinations of human beings.

Since this is a criminal matter, of course, your verdicts, except with respect to the existence of mitigating factors, as I said before, must be unanimous. All twelve jurors deliberating must agree, and you should decide the case without any bias or prejudice.

In order to assist you during your deliberations, I've prepared for you a verdict form that you can complete. I think it is self-explanatory. There are three places on the form for the foreperson to sign, and that will be you, please, if you will sign it ultimately at the appropriate place, ma'am.

Just one thing with the form. It is self-explanatory, I think, as I said before. However, under mitigating factors, factor number one, "The defendant has no

history of criminal activity," you must complete that yes, because it's been
stipulated and agreed that he has no history of criminal activity. Other than that,
I think the form is self-explanatory and you can complete it.

Defendant claims that those instructions repeatedly and errone-
ously emphasized that the jury should return a unanimous verdict,
thereby rendering the jurors "far less free to return a non-
unanimous verdict than a unanimous one." Defendant points out
that first, the trial court said, "Your verdict must be unanimous."
Then, the trial court told the jury, "If in my opinion, further
deliberations will not result in a unanimous agreement on the
verdict, then I will impose the appropriate penalty." And, finally,
the court stated, "Since this is a criminal matter, of course, your
verdicts, except with respect to the existence of mitigating factors
... must be unanimous. All twelve jurors deliberating must
agree." Defendant also points to a statement made by the court
after the jury returned its verdict as evidence of the court's
misunderstanding of the law applicable to the sentencing portion
of a capital trial: "I'm going to ask each of you one by one if that
is the way you voted, just to be sure that the verdict is unanimous,
as required by law." The State responds that the trial court's
instructions adequately explained that the jury could return a non-
unanimous verdict and properly instructed the jurors that they
had to agree unanimously in order to find the existence of the
aggravating factor but did not have to agree to establish the
mitigating factors. The State points out that after properly
explaining the law in respect of aggravating and mitigating fac-
tors, the trial court instructed the jury about unanimity in relation
to its final determination:

If, after careful, conscientious and thorough deliberations, you're unable to agree
upon your finding and your verdict, then you should report that to me. If in my
opinion, further deliberations will not result in a unanimous agreement on the
verdict, then I will impose the appropriate penalty, which will be the sentence of
imprisonment to which I just referred.

Those instructions, in the State's view, informed the jury that if it
was unable to agree unanimously about defendant's sentence, the
court would sentence him to a term of imprisonment. The State
further argues that defendant's reliance on *Ramseur* and *Hunt* is

inapposite, because the jury never indicated that it was unable to reach a unanimous verdict, as had the juries in those two cases, so the trial court never was called on to re-instruct the members.

In response to defendant's reliance on the statement made by the trial court *after* the jury returned its verdict, the State suggests that the statement is irrelevant to defendant's argument and, in fact, proper. The trial court stated, "I'm going to ask each of you one by one if that is the way you voted, just to be sure that the verdict is unanimous, as required by law."

The State contends that because this statement was made after the jury returned its verdict, it has no bearing on defendant's claim that the jury instructions improperly emphasized the need for a unanimous verdict. In any event, because a verdict imposing the death penalty does have to be unanimous, the statement was manifestly proper.

**B**

██ There is no question but that "clear and correct jury instructions are essential for a fair trial" because the jury charge "is a road map to guide the jury, and without an appropriate charge a jury can take a wrong turn in its deliberations." *State v. Koskovich,* 168 *N.J.* 448, 507, 776 *A.*2d 144 (2001) (internal citations omitted). As an indication of the paramount importance of accurate jury instructions, we have held that erroneous instructions on material issues are presumed to be reversible error. *State v. Martin,* 119 *N.J.* 2, 15, 573 *A.*2d 1359 (1990); *State v. Grunow,* 102 *N.J.* 133, 148, 506 *A.*2d 708 (1986). It is "even more crucial" that jury instructions in capital cases be proper, because juries in capital cases must decide whether the defendant will live or die. *Koskovich, supra,* 168 *N.J.* at 524, 776 *A.*2d 144.

██ The case law relied upon by defendant in his second PCR petition does not support his position. In *Ramseur,* we observed that the jury at a capital sentencing trial can return one of three possible verdicts: a unanimous verdict for a death sentence, a unanimous verdict for a life sentence, or a non-unanimous

verdict, which would result in a sentence other than death. 106 *N.J.* at 311–12, 524 *A.*2d 188. *Ramseur* required that "juries in capital cases be informed of, and free to exercise, their statutory option to return a final, non-unanimous verdict resulting in imprisonment" if, after a reasonable period of deliberation, the jurors demonstrate an inability to agree unanimously. *Id.* at 312, 524 *A.*2d 188. Here, the trial court emphasized that a verdict imposing the death sentence must reflect the unanimous decision of the jury. That is a true statement of the law. The trial court also instructed the jury that a non-unanimous verdict would result in a sentence of imprisonment for a term of years or life. That statement informed the jury of the outcome if the defendant did not receive the sentence of death. It is also a true statement of the law.

■ In *Hunt,* we held that jury instructions in the penalty phase of a capital trial must not indicate, nor arise from, a "desire to produce unanimity." 115 *N.J.* at 385, 558 *A.*2d 1259. Here, the trial court's instruction—that the jury must be unanimous in order to sentence defendant to death and that, in the event the jury members could not agree, the court would determine whether further deliberations were appropriate—is in accord with *Hunt.* Rather than improperly indicating a desire to achieve unanimity, those instructions emphasized that a death sentence would issue only if the jury unanimously agreed to impose it, and that any other verdict would result in a prison sentence.

It would have been preferable in this case, for the trial court to have more precisely informed the jury that a non-unanimous verdict was acceptable and that unanimity referred only to a verdict to impose the death sentence. Our capital punishment jurisprudence has evolved substantially since defendant's trial and trial courts today are more familiar with the preferred formulation of the charge in respect of a jury's options in the penalty phase. Nevertheless, we are fully satisfied that the charge in this penalty-phase trial, although not perfect, did not mislead the jury, and therefore, did not constitute error. The trial court appropriately

instructed the jurors regarding their duties in rendering a sentence, informed them of the option of returning a non-unanimous verdict, and did not coerce them to return a unanimous verdict.

## IV

The judgment of the Law Division denying defendant's petition for post-conviction relief is affirmed.

LONG, J., dissenting.

## I

When death is on the table, as it is in this case, courts should never stand on ceremony. Thus, unlike the majority, I would relax the time bar of Rule 3:22–12. Not only is a "significant liberty interest" at stake, *State v. Mitchell,* 126 *N.J.* 565, 580, 601 *A.*2d 198 (1992), but life itself. Although the efficient administration of justice requires enforcement of procedural bars, certain interests transcend finality and efficiency. Among those concerns, life is paramount. Any potential prejudice to the State in having to retry Marshall's penalty phase cannot trump his interest in life.

## II

Separate and apart from my opposition to the application of any procedural preclusion to a post-conviction relief petition in a capital case, I believe that the majority's reliance on *Rule* 3:22–5 to bar Marshall's claim is misplaced.

We explained in *State v. Marshall,* 148 *N.J.* 89, 149, 690 *A.*2d 1 (1997) (*Marshall III*) (quoting *State v. Bontempo,* 170 *N.J.Super.* 220, 234, 406 *A.*2d 203 (Law Div.1979)), that a claim is procedurally barred under *Rule* 3:22–5 "only if the issue raised is identical or substantially equivalent to that adjudicated previously." Relying on that notion, the majority holds that the issue before us has already been decided, citing argument F.18 in Marshall's first post-conviction relief petition. As noted, F.18 was one of more

than 500 points raised in that petition. To say that its presentation was perfunctory is an understatement. Citing excerpts from the penalty phase jury instruction, F.18 stated only:

> The defendant was denied his right to fundamental fairness, due process and his right to a fair and reliable penalty trial, and was subjected to cruel and unusual punishment, in violation of Article I, Paragraphs 1, 10 and 12 of the New Jersey Constitution, and the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, in that the trial court's penalty phase instructions inadequately explained that a non-unanimous verdict was acceptable.

When Marshall's first petition was denied, his appellate counsel reduced F.18 even further: "The trial court's penalty phase instructions inadequately explained that a non-unanimous verdict was acceptable."

Because F.18 and the appellate brief were so cursory, our treatment of them in the *Marshall III* opinion was as summary as the claim itself. The Court simply dismissed all of Marshall's penalty-phase jury instruction arguments in a single sentence:

> We reject those claims on the merits on the same basis that we reject the claims of penalty-phase ineffectiveness relating to trial counsel's failure to request specific instructions in the penalty phase.
>
> [*Marshall III, supra,* 148 *N.J.* at 257, 690 *A.*2d 1.]

The drafter of Marshall's second petition focused his lens more carefully and argued that, although the penalty phase instruction nominally informed the jurors of the option of non-unanimity, it discouraged them from that course of action. More particularly, the petition argued that the charge "left the jury far less free to return a non-unanimous verdict than a unanimous one." When that petition was denied, Marshall's appellate brief put the argument this way:

> The Jury Penalty Phase Instructions So Denigrated The "Third Option" Of A Non Unanimous Verdict That Any Reasonable Juror Hearing Those Instructions Would Have Believed That Unanimity Was The Preferred Verdict And Non Unanimity A Less Preferred Verdict Returnable Only After The Judge Determined That A Unanimous Verdict Could Not Be Reached.

Contrary to the majority's holding, there is a difference between failing to inform jurors that a non-unanimous verdict can be rendered and discouraging them from doing so. Those are entirely distinct legal claims, previously recognized by us as such.

Indeed, in *State v. Ramseur*, 106 *N.J.* 123, 312, 524 *A.*2d 188 (1987), we emphasized that there are two critical aspects of a jury instruction on non-unanimity: (1) informing the jury of that option, and (2) leaving the jury "free to exercise" that option. That is the distinction between Marshall's first and second petitions. Yet, the Court holds that the argument advanced here is "implicit" in Marshall's first petition, effectively collapsing into one that *Ramseur* separated into two.

It may be, as the majority conjectures, that the drafters of F.18 intended it to encompass all of the relevant unanimity arguments. It also may be that this Court intended to dispose of all such claims. But neither acted so clearly or specifically that we can be assured that Marshall's present claim was, in fact, considered and rejected. At best, whether Marshall's new argument was included in F.18 is a debatable proposition. Where debatable, the benefit of the doubt should be accorded to a defendant facing death, and the issue raised should be reviewed on the merits.

### III

Turning to the merits: Based on the infirmity in the jury instruction regarding unanimity, Marshall's post-conviction relief petition should have been granted, and the matter remanded for a new penalty-phase trial.

The *Judges Bench Manual for Capital Causes* provides a template for the instruction at the penalty phase of a capital trial. The point of departure for every instruction is a proffer to the jury of all possible dispositions in the case. The first line of the Model Charge is as follows: "Members of the jury, the Legislature of New Jersey has given to you, as a jury and to each of you individually the responsibility of deciding whether defendant _____ is to be put to death or is to be subjected to a term in the New Jersey State Prison." *Judges Bench Manual for Capital Causes* (November 2001). The Model Charge then directs the court to outline all possible sentences a defendant can receive. Neither of those requirements was satisfied here. At Marshall's

sentencing trial, the instruction opened only with the option of death: "Ladies and gentlemen, now you have to decide whether or not the defendant is to be sentenced to death. Quite obviously, your ultimate decision in that regard is extremely important, both from the perspective of the State of New Jersey and from the viewpoint of the defendant." The trial court made no mention of the possibility of a sentence other than death until much later in the charge. However, at that point, a different problem arose. The court instructed the jury that, if it found that the aggravating factor outweighed the mitigating factors, Marshall would be sentenced to death but if it determined that the aggravating factor did not outweigh the mitigating factors, Marshall would be sentenced to a period of thirty years to life with no parole for at least thirty years.

Unfortunately, immediately following that explanation, the trial court stated: "Your verdict must be unanimous. You must all agree as to the existence or nonexistence of the alleged aggravating factor." Both of those statements are incorrect. First, there is no requirement that the jury verdict be unanimous. *Ramseur, supra,* 106 *N.J.* at 312, 524 *A.*2d 188. A non-unanimous verdict is perfectly acceptable, and there is no preference for unanimity. *State v. Hunt,* 115 *N.J.* 330, 384–85, 558 *A.*2d 1259 (1989). Second, although the finding of the existence of an aggravating factor must be unanimous, the jury clearly does not need to agree unanimously regarding the non-existence of an aggravating factor. Only one juror needs to disagree. Because the burden is on the State to prove the aggravating factors beyond a reasonable doubt, the State fails to meet that burden if one juror is not convinced. *State v. Muhammad,* 145 *N.J.* 23, 52, 678 *A.*2d 164 (1996).

The trial court continued in equally problematic terms:

If, after careful, conscientious and thorough deliberations, you're unable to agree upon your finding and your verdict, then you should report that to me. If in my opinion, further deliberations will not result in a unanimous agreement on the verdict, then I will impose the appropriate penalty, which will be the sentence of imprisonment to which I just referred.

That instruction demonstrates confusion on the part of the trial court about its different roles at the guilt and sentencing phases of a capital trial. Although the trial court can require a jury to deliberate further in order to reach a unanimous decision during the guilt phase, its role at the sentencing phase is circumscribed to determining if there has been sufficient jury deliberation "to assure confidence in the ultimate verdict, whether or not it is unanimous." *Hunt, supra,* 115 *N.J.* at 385, 558 *A.*2d 1259. The reason the trial court plays a different role in the two phases is because a jury deadlock at sentencing leads to a valid verdict, whereas a deadlock at the guilt phase leads to a mistrial. Here, the trial court indicated that *it* would determine whether continued deliberations would enable the jury to achieve a unanimous verdict, thus underscoring for the jury that unanimity was the goal. Had the court, in fact, required a non-unanimous capital jury to continue deliberating in order to achieve unanimity, a reversal clearly would have followed. Leaving the jury with the impression that unanimity is preferred should have the same effect. *See ibid.* (stating that instructions to continue deliberating "should not follow from a desire to produce unanimity, to assure that the jury has deliberated sufficiently to assure confidence in the ultimate verdict, whether or not it is unanimous").

Those incorrect statements by the trial court were not isolated slips. Indeed, nearly the last words the jury heard from the court underscored what had gone before:

> Since this is a criminal matter, of course, your verdicts, except with respect to the existence of mitigating factors, as I said before, *must be unanimous.* All twelve jurors deliberating must agree, and you should decide the case without any bias or prejudice.

It is true that the jury need not be unanimous in its decisions regarding mitigating factors. It is entirely incorrect, however, to suggest even obliquely that the jury *must* be unanimous about everything else. Unlike the guilt phase, non-unanimity at the penalty phase results in a verdict. The twelve deliberating jurors are not required to agree about anything. That concept should be the focus of the penalty phase instruction. Not only was it not the

focus, but an incorrect spotlight on unanimity pervaded the charge.

The majority's conclusion that the charge "did not mislead the jury," *ante* at 360, 801 *A.*2d 1154, is impossible to reconcile with reality. The charge was plainly wrong and prejudicial to Marshall. The danger of such an instruction is obvious. In the penalty phase of a capital case, a single juror can make the difference between life and death. *N.J.S.A.* 2C:11–3f. That crucial truth must be part of the instruction. If jurors are consistently encouraged toward unanimity and are left with the impression that unanimity is the preferred verdict, the deck is essentially stacked against a legitimate and life-saving non-unanimous verdict. The point of deliberating at the penalty phase is to reach a verdict, unanimous or otherwise. Unanimity is not preferred over non-unanimity and jurors must understand that fact. See *N.J.S.A.* 2C:11–3f (requiring the trial court to inform the jury that a non-unanimous verdict is acceptable and will result in a sentence other than death); *see also State v. Brown*, 138 *N.J.* 481, 527, 651 *A.*2d 19 (1994) (holding that where single juror could disagree with verdict if given proper instruction on non-unanimity, but incorrect one is given, reversal is required).

Here, the jury was pondering the fate of a defendant with *no* prior criminal record. It is not at all fanciful to suggest that a single juror could have concluded that a sentence of at least thirty years without parole would be sufficient punishment for Robert Marshall, despite the awful crime for which he was convicted. That juror would be significantly *less* likely to reach such a result under the instructions that were given.

## IV

This Court has overturned death sentences in the past due to jury instructions at sentencing that erroneously emphasized the importance of a unanimous verdict. *See Hunt, supra,* 115 *N.J.* 330, 558 *A.*2d 1259; *State v. Bey,* 112 *N.J.* 123, 179–80, 548 *A.*2d 887 (1988); *Ramseur, supra,* 106 *N.J.* 123, 524 *A.*2d 188; *see also*

*State v. Clausell,* 121 *N.J.* 298, 346, 580 *A.*2d 221 (1990) (reversing on other grounds but instructing trial court to deliver proper instructions on remand). Robert Marshall's claim closely mirrors the claims of the defendants in those cases. His contention that the jury instructions at sentencing were erroneous and violative of his constitutional protections is correct and warrants reversal of his death sentence.

*For affirmance*—Chief Justice PORITZ, and Justices STEIN, COLEMAN, LaVECCHIA, and ZAZZALI—5.

*For reversal*—Justice LONG—1.