**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0957-19T6

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

JOHNNY MILETE,

    Defendant-Respondent.

_____

> Argued March 25, 2020 – Decided December 22, 2020
>
> Before Judges Fuentes, Mayer and Enright.
>
> On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 18-09-0772.
>
> Ali Y. Ozbek, Assistant Prosecutor, argued the cause for appellant (Carmelia M. Valdes, Passaic County Prosecutor, attorney; Ali Y. Ozbek, on the briefs).
>
> Gregory Aprile argued the cause for respondent.

The opinion of the court was delivered by

FUENTES, P.J.A.D.

A Passaic County Grand Jury indicted defendant Johnny Milete with attempted murder, N.J.S.A. 2C:11-3 and N.J.S.A. 2C:5-1, second degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b), and second degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a). At trial, the petit jury found defendant guilty of second degree unlawful possession of a handgun, and acquitted him of attempted murder, four lesser included offenses of aggravated assault, and possession of a firearm for unlawful purpose. On these charges, the jury found defendant acted in self-defense.

Defendant thereafter moved for a judgment of acquittal or alternatively for a new trial. The parties submitted briefs in support of their respective positions and presented oral argument to the trial judge over two separate days. After oral argument, the State submitted a supplemental brief followed by a reply brief from defense counsel. After considering the arguments of counsel and reviewing the evidence presented to the jury, Judge Buono Stanton vacated the conviction and granted defendant's motion for a new trial pursuant to Rule 3:20-1. The judge explained her reasoning in a comprehensive oral decision delivered from the bench, followed by an equally well-reasoned memorandum of opinion.

A-0957-19T6

The judge found the record of the charge conference[1] revealed that defense counsel initially asked her to instruct the jury on the "necessity or justification defense" as codified in N.J.S.A. 2C:3-2(b).  Defense counsel acquiesced to the judge's misgivings about the viability of this defense and withdrew his request for a "necessity charge."  Counsel was under the mistaken belief that the essence of this defense was "interchangeable" with the self-defense charge.  The judge ultimately determined that this fundamental misapprehension of the necessity charge deprived the jury of proper legal guidance.  Consequently, this material defect in the jury charges deprived defendant of a fair trial.  This can only be corrected by affirming the trial judge's order granting defendant's motion for a new trial.

The judge made clear, however, that the concept of an "unjust result" does not imply a judicial determination of defendant's innocence.  Rather, the absence of clear judicial instructions on the affirmative defense of "necessity or justification" coupled with the failure to include this affirmative defense as a

_____

[1] Rule 1:8-7(b) directs, in relevant part, that "[p]rior to closing arguments, the court shall hold a charge conference on the record in all criminal cases."  The transcript of the charge conference was not yet available at the time this issue came before the trial court.  The trial judge reconstructed the verbatim record of the charge conference from CourtSmart.  The parties have not challenged the accuracy of the reconstructed record.

A-0957-19T6

part of the verdict sheet, constituted an unjust result. Without legal guidance, the jury was unable to properly consider the evidence in this case. The judge rejected the State's argument that this legal failure was the result of invited error. Relying on State v. Jenkins, 178 N.J. 347, 360 (2004), the trial judge candidly admitted she deleted any reference to the necessity defense from the verdict sheet "independent of any invitation or encouragement" from defense counsel.

By leave granted, the State argues the trial court erred in granting defendant's motion for a new trial because the instructions the judge provided the jury properly addressed all relevant legal issues. We disagree and affirm substantially for the reasons expressed by Judge Buono Stanton. We derive the following facts from the judge's findings, as supported by the record developed during the trial.

I.

Defendant testified in his own defense. At the time this incident occurred, defendant resided in the City of Paterson with his mother, younger brother, sister, his niece, and his nephew. He was not married and was employed as a landscaper.[2] At approximately three o'clock in the morning on June 24, 2018,

---

[2] Defendant admitted he had two prior criminal convictions. The first occurred on January 18, 2011, and involved possession of a controlled dangerous

defendant left a social club, picked up a woman identified as Jahara Nieves, and drove directly to Mr. Chimi's Food Truck. As he had done on prior occasions, defendant testified that he intended to buy takeout food and eat at home.

Security camera footage captured the incident that transpired which ultimately led to the criminal charges filed against defendant. The trial judge admitted the videorecording into evidence and showed it to the jury. As defendant waited for his food, Nieves said she was cold and returned to the car. At some point thereafter, defendant saw Miguel Soto, the man whom the State identified as the victim in this case. According to defendant, when he made a gesture to shake his hand, Soto said "get the fuck out of my face." In response to his attorney's question, defendant characterized Soto's tone as "aggressive." As Soto became more aggressive and started walking toward him, defendant testified he "grabbed [Soto's] wrist" and told him several times: "I don't want no problems."

Defendant let go of Soto's wrist and raised his hands with opened palms up. Defendant claimed Soto "swung two punches that missed and he hit me after

substance, a third degree offense. The second occurred on September 13, 2011, and also involved a third degree offense. He pled guilty to both offenses and was sentenced on July 24, 2015 to serve an undetermined term of incarceration at the Passaic County Correctional Facility.

A-0957-19T6

that." Defendant backed away and raised his arms to block Soto's punches. Soto then "kind of put [defendant] . . . in a headlock while pulling off [his] tank top." Defendant testified that he "lost consciousness . . . [and] while in the unconscious state, I was getting beat. I was feeling hits in my back and my face and my head." He also claimed Soto's friends "jumped" him. Although he was not entirely certain how many people were involved in the melee, he believed there were "at least three more."

Defendant provided the following description of what occurred next:

> I . . . remember being on my side. I was unconscious on my side. I was feeling the hits, though. [W]hen I got . . . woken up . . . I'm not sure exactly how he did it, but one of them, they like crushed my knee, like I guess they stomped it. But it hurted [sic] so bad, like . . . it put me in like a shocking state. I got right up. Like, I jumped right up. And then the guy who was hitting me, he was hitting me with a gun. He was the one hitting me with a gun. Like, my tank top was like wrapped in -- to his gun. And he kind of pulled -- well, I grabbed on to his arm. He pulled me out of the . . . (indiscernible) from being jumped. But I had control of his gun. I pulled him. He was holding the gun through the -- through the front right here. I had -- he was hitting me with the clip, I guess --
>
> . . . .
>
> -- or slapping me with the (indiscernible). I grabbed the gun like that. I had full control of the gun after that.

6

> I pulled my tank top -- pulled my tank top off. I -- and he stood where he was at, but I was -- I ended up pointing it at Miguel Soto.

In response to defense counsel's follow-up questions, defendant clarified that although he was not able to identify the person who struck him several times with a handgun, defendant was certain Miguel Soto was not that person. Defendant also admitted that after he took possession of the handgun, he pointed it at Miguel Soto "[b]ecause the other guy . . . [just] stood where he was at. And Miguel Soto . . . was like aggressive. Like he . . . didn't even care that I had the gun."

According to defendant, Soto remained unphased: "He was looking at me like with a mean face, told me he was going to kill me . . . . Like, he was going to kill me even though I was . . . pointing a gun at him and he told me he was going to kill me." Defendant testified he and the other participants in the squabble did not move. Finally, defendant placed the handgun in his "right pocket" and began to walk to his car. Jahara Nieves was standing outside the car. Defendant testified that after he "grabbed the car keys" from Nieves, she called out his name to alert him of something coming from behind. When defendant looked back, he "saw them coming like as in [an] ambush thing. I told her to back up. And . . . I proceeded to . . . shoot."

A-0957-19T6

In response to his attorney's questions, defendant explained:

> I wanted to protect her, too. I told her to move back. While walking towards them, like, I got the feeling of -- when I stand up -- like if you stand up too fast, everything starts turning white and you -- it was -- everything was turning white to me. And I . . . was in the middle of shooting.
>
> When I fired the third shot, the whiteness already cleared out and I didn't see him there or none of his friends. I was shooting in the direction of exactly where I saw him at.

Defendant testified that he saw Miguel Soto coming at him with two individuals to the right, two in the middle, and possibly two more on the other side, "or maybe it could have been one." He thought they were going to take the handgun from him; he shot purely in self-defense and was not aware the handgun was loaded before he fired. Defendant testified that the handgun "didn't even shoot at first . . . I was like completely like almost white in my -- like my eye, my vision. But I just cocked it because I knew, like, you either cock it or maybe -- I don't even know why the trigger wasn't even moving."

Other than firing the handgun three times, defendant did not remember "what actions" these individuals took immediately thereafter. He described feeling briefly disoriented. After he regained his composure, he noticed that all of the men were gone. He returned to his car, where Jahara Nieves was standing,

A-0957-19T6

and told her to get in. As defendant drove away from the scene, he "threw the gun out the window, [of the] right-side passenger seat." Defendant provided the following description of the injuries he sustained in the altercation:

> I have a scar on the top of my head. It was open. It was open. On both of my side of my cheeks I was down to my red meat – I mean, to my white meat. And I had knots on my head. And like from the kicks to my back, like bruises. Oh, and my knee. That was the worst thing. It was all black. He crushed my knee.

Defendant did not consult a doctor or receive any medical attention related to these injuries.

Miguel Soto died in an unrelated motor vehicle accident in April 2019, two months before the start of the trial. The State's case was thus primarily based on the videorecording of the event taken by security cameras located in the parking lot.

## II.

Rule 1:8-7(b) requires the trial judge "to hold a charge conference on the record in all criminal cases." Here, the judge conducted the charge conference over two days on June 5th and 6th, 2019, "which lasted collectively for about five hours." Defense counsel gave notice to the prosecutor in advance of trial of all three affirmative defenses: self-defense, duress, and necessity. At the charge conference held on June 5, 2019, defense counsel requested the judge

9

charge the jury that all three defenses applied to all of the charges against defendant, including second degree unlawful possession of a handgun. The prosecutor disagreed.

The Criminal Code defines the defense of "necessity" as follows:

> Conduct which would otherwise be an offense is justifiable by reason of necessity to the extent permitted by law and as to which neither the code nor other statutory law defining the offense provides exceptions or defenses dealing with the specific situation involved and a legislative purpose to exclude the justification claimed does not otherwise plainly appear.
>
> [N.J.S.A. 2C:3-2(a).]

Defense counsel offered the following hypothetical facts in support of his request to the judge to charge the jury to consider "necessity" as an affirmative defense to the unlawful possession of a handgun charge:

> Suppose I'm walking along the street and somebody comes up to me with a gun to rob me. And I manage to disarm the person, take the gun from him, and start walking away from him. Technically, because I'm holding onto the gun, I'm in unlawful possession of the gun.
>
> Do we really believe that I would or should be charged under those circumstances with the unlawful possession of the gun when that's the reason why I took it, for self-protection, or because it was being threatened to be used against me?

A-0957-19T6

So I certainly I'm sure cannot be precluded from arguing something like that to this jury. The question does come down to as to whether, again, the circumstances under which my client, at least according to him, took possession of this gun, whether it constitutes a defense to even the unlawful possession. And I . . . think it's something that the jury should consider.

The prosecutor conceded that under these hypothetical facts, the trial court would have a rational basis to charge "self-defense" related to attempted murder. However, the prosecutor argued that a claim of self-defense did not negate the elements of the unlawful possession of a weapon. At the charge conference held on June 5, 2019, the judge did not address nor analyze defendant's request.

The bulk of the discussion the second day of the charge conference involved defendant's request to charge the jury with the affirmative defense of duress, which the judge ultimately denied. The only time the necessity defense was mentioned on the second day is reflected in the following brief interaction between the judge and defense counsel:

THE COURT: Now, I just want to address -- I know you put in a defense of necessity originally.

DEFENSE COUNSEL: Right.

THE COURT: And is that -- do you want a ruling on that? I know it says here under [N.J.S.A.] 2C:3-2(b), it doesn't apply when you have a self-defense.

11

DEFENSE COUNSEL: I saw that, too, Judge. Yes.

 . . . .

THE COURT: And so are you withdrawing that notice?

DEFENSE COUNSEL: I will withdraw that. Yes, Your Honor.

In his summation, defense counsel argued that under the circumstances confronted by defendant, the jury should view his spontaneous decision to temporarily seize the handgun as a reasonable and necessary act of self-preservation:

> The unlawful possession of a weapon, that -- the self-defense charge technically doesn't apply to that, as I told you. But if, ladies and gentlemen, this gun was taken by Mr. Milete after it was used against him, not shot -- not shot -- not shot but used in other ways, if that was taken by him as he got away, right, and think about it, if that was the case and the gun was even laying around and that, would you discard the gun right there so that whoever it was that was attacking you could pick it right back up again and use it again? Of course, you're going to take it with you. Of course.
>
> It's too bad -- although it made sense, it's too bad that he did that. As smart as it was, they were not, I'm sure, giving it a whole lot of thought as a reaction to do that. It's unfortunate in that, if he hadn't done that, then he wouldn't have had the gun to fend off the second attack or the approach of Mr. Soto and his friends. Maybe something else would have happened to him, if he hadn't done that but that, we know.

12

Are we going to say, of course, he didn't have a permit for that gun. It wasn't his gun. Are we going to say that he's guilty of possession of that gun, too, under those circumstances? I mean, if somebody came up to you on the street and approached you, let's not even say with a gun, with a knife to rob you and you managed to get that knife from that person and you took it with you as you were getting away, are you really guilty of possession of that knife? The only reason why you took possession of it really was to make sure it wasn't used against you. So although, technically, the self-defense does not apply to that charge, you have to consider whether my client's possession of that gun for that brief period of time for those circumstances constitutes even a violation of that statute.

[(emphasis added).]

By contrast, when the prosecutor addressed the jury in summation, he framed the task before them as a straightforward, mechanical application of the statutory standards to the uncontested fact that at some point in the altercation, defendant possessed the handgun without the legally required permit:

So S-1, there was a gun. We know there is a gun. One, we saw the flashes on the video. Mr. Milete even testified he shot the gun. We have the shell casings to show his fire, and we also have a bullet hole.

The second element the State has to prove, the defendant knowingly possessed a handgun. He shot it three times. He possessed it. Not only did he possess it, he took it with him. He possessed that gun. He didn't pick it up, fire, drop it and leave. He possessed it. He knowingly possessed that gun. He knew what it was, he fired it, he possessed it.

A-0957-19T6

Element three. The defendant did not have a permit to possess a weapon. S-20 in evidence.[3] From the State Police, meaning that they ran Mr. Milete, he does not have a permit to own any firearms. Three elements, one, two, and three and that's how you get to guilt beyond that count, ladies and gentlemen.

The jury began deliberating at approximately 1:35 p.m. In the course of deliberations, the jury sent out a note with the following question: "what is a sufficient period of time for possession?" Pursuant to Rule 1:8-8(b)(2), the jurors were given written copies of the charges to take with them during deliberations. Specifically, the bottom of page twenty-nine of the charges stated that to: "Possess an item, one must knowingly procure or receive an item or be aware of his control thereof for a sufficient period of time to have been able to relinquish his control if he chose to do so."

After consulting with counsel, the judge decided to bring the jurors into the courtroom and direct their attention to the page number in the charges that addressed the concept of "possession." The judge reread to the jury the same standard charge on possession. This prompted a lively exchange between the

---

[3] This stipulation admitted into evidence an affidavit from a New Jersey State Police Detective who attested that a search of the records "failed to reveal the defendant making application for, or being issued, a Permit to Carry a Handgun, Permits to Purchase Handguns, a Firearms Purchaser Identification Card, or a Permit for an Assault Weapon."

A-0957-19T6

judge and a number of unidentified jurors, who expressed their dissatisfaction with how the concept of "possession" was defined in the jury charges. In an attempt to assuage the jury's consternation in this respect, the judge provided the following response:

> Okay, unfortunately, I think the parties will agree that I cannot give you any more of a definition . . . than that is as required.
>
> I do note that that is contained within a larger paragraph, to possess an item under the law, one must have a knowing, intentional control of that item accompanied by a knowledge of its character.
>
> So a person who possesses an item such as a handgun, must know or be aware that he possesses it, and he must know what it is that he possesses or controls, that is a handgun.
>
> In other words, to possess an item, one must knowingly procure or receive an item or be aware of his control thereof for a sufficient period of time to have been able to relinquish his control if he chose to do so.
>
> You're the jurors, you can decide based on the evidence in this case if you feel, based on the evidence in this case, if there was possession, if you -- considering -- if there was sufficient period of time to have been able to relinquish his control if he chose to do so.
>
> Other than that, I cannot give you any more guidance than that. You are the judges of the facts. The facts is the evidence, the evidence includes information that may assist you in applying the facts or the evidence or lack thereof, to what the instructions are.

> Remember evidence or lack thereof or inferences or reasonable inferences, your common sense, what a reasonable person would think, all those words that I had previously shared with you.

The judge noted for the record that she received the jury's note that prompted this interaction and supplemental instructions at 2:41 p.m. The judge received the envelope containing the jury's verdict sheet at 3:05 p.m. The jury acquitted defendant of attempted murder, including the lesser included offenses, and possession of a handgun for an unlawful purpose, and guilty of second degree unlawful possession of a handgun. On June 14, 2019, defendant filed a motion for judgment of acquittal, or in the alternative, a motion for a new trial. After considering the briefs submitted by the parties and hearing the argument presented by counsel, the judge denied defendant's motion for acquittal under Rule 3:18-1, but granted his motion for a new trial under Rule 3:20-1.

## III.

Judge Buono Stanton explained her reasons for granting defendant's motion for a new trial in a comprehensive, well-written memorandum of opinion. As the judge who presided over this trial, we will rely on the account she provided to fill in any factual gaps related to what occurred during the charge conference. The transcripts of the charge conference corroborate Judge Buono

16

Stanton's account that defense counsel did not submit a draft instruction on the affirmative defense of necessity.

Rule 3:20-1 authorizes the trial court to grant a motion for a new trial "in the interest of justice." In her analysis of defendant's argument, Judge Buono Stanton noted that "'clear and correct jury instructions are essential for a fair trial' because the jury charge 'is a road map to guide the jury, and without an appropriate charge a jury can take a wrong turn in its deliberations.'" State v. Marshall, 173 N.J. 343, 359 (2002) (quoting State v. Koskovich, 168 N.J. 448, 507 (2001)).

The dispositive legal issue is whether justification by necessity, as codified in N.J.S.A. 2C:3-2(b), can apply as a defense to the regulatory crime of unlawful possession of a handgun, N.J.S.A. 2C:39-4(a) under the material facts of this case. In State v. Harmon, our Supreme Court held:

> [T]he policies embodied in our gun control laws, N.J.S.A. 2C:39-3 and -5, would not allow self defense as an excuse or justification to a charge of unlawful possession under a regulatory offense when a person arms himself prior to a danger becoming imminent. Only in those rare and momentary circumstances where an individual arms himself spontaneously to meet an immediate danger should the justification afforded by N.J.S.A. 2C:3-4 be considered.
>
> [104 N.J. 189, 208-09 (1986) (emphasis added).]

A-0957-19T6

The Court reaffirmed these principles of justification and defense to a regulatory offense in State v. Kelly, 118 N.J. 370, 385 (1990).

Here, defense counsel raised this defense as part of defendant's trial strategy of self-defense. Although the State's version of events may not support a Harmon/Kelly jury charge, the verdict acquitting defendant of all of the charges, except for the unlawful possession of a weapon, supports a rational inference that the jury accepted defendant's version of events. The failure to provide a necessity instruction under these circumstances constitutes a manifest injustice and warrants a new trial. Defendant testified he was beaten and pistol whipped by as many as five assailants. He managed to seize possession of the handgun in a spontaneous act of self-protection. He thereafter used the weapon only to repel the onslaught of his assailants and discarded it as soon as he believed it was safe to do so under the circumstances.

Judge Buono Stanton also correctly rejected the doctrine of invited error under the prevailing circumstances. The judge found defense counsel candidly admitted he should have pursued the necessity defense more forcibly when the judge dismissed it as inapplicable under these circumstances. To her credit, the judge also acknowledged in her memorandum of opinion that the jury's question in the note:

18

made it obvious that they struggled with the possession count that the charge of necessity should have been given both in the original charge and in response to the jury's question. Indeed, if it had been given originally, I do not believe that the jury would have needed to send that note.

We review a trial judge's decision to grant defendant's motion for a new trial under Rule 3:20-1 under an abuse of discretion standard, based on the competent evidence presented by the parties, "and with deference to the trial judge's feel for the case and observation of witnesses." State v. Terrell, 452 N.J. Super. 226, 268-69 (App. Div. 2016), aff'd o.b., 231 N.J. 170 (2017). We discern no basis to question Judge Buono Stanton's thoughtful, well-reasoned analysis.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION