**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-0145-19
       A-2352-19

STATE OF NEW JERSEY,

  Plaintiff-Respondent,

v.

KELVIN BARNES,

  Defendant-Appellant.

_____

STATE OF NEW JERSEY,

  Plaintiff-Respondent,

v.

DEWAN DENNIS,

  Defendant-Appellant.

_____

    Submitted January 31, 2022 – Decided July 25, 2022

    Before Judges Messano and Rose.

    On appeal from the Superior Court of New Jersey, Law
    Division, Mercer County, Indictment No. 06-04-0545.

Joseph E. Krakora, Public Defender, attorney for appellant Kelvin Barnes (Al Glimis, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant Dewan Dennis (Steven M. Gilson, Designated Counsel, on the brief).

Angelo J. Onofri, Mercer County Prosecutor, attorney for respondent (Daniel Opatut, Assistant Prosecutor, of counsel and on the briefs).

Appellant Dewan Dennis filed a pro se supplemental brief.

PER CURIAM

A jury convicted defendants Kelvin Barnes and Dewan Dennis of conspiracy, three counts of murder, three counts of felony murder, multiple counts of aggravated arson, and other related offenses. State v. Dennis and State v. Barnes, Nos. A-1055-07; A-3147-07 (App. Div. Mar. 2, 2011) (slip op. at 2). Three other co-defendants, Andre Thomas, Kareem Singleton and Tyhir Dennis, entered guilty pleas prior to trial and testified against defendants.[1] Id. at 2–3.

The judge sentenced both defendants to consecutive life terms of imprisonment, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. Id. at

---

[1] Because Tyhir Dennis shares the same last name as one of the defendants, we refer to him throughout the opinion by his first name to avoid confusion.

A-0145-19

2.  We affirmed defendants' convictions and sentences on direct appeal.  Id. at 3.  The Court denied their petitions for certification.  207 N.J. 188 (2011).

Each defendant filed a petition for post-conviction relief (PCR) generally alleging ineffective assistance of counsel (IAC).  Two different Law Division judges considered the respective petitions.  On Barnes' petition, the PCR judge ordered a limited evidentiary hearing as to whether trial counsel was constitutionally ineffective for failing to investigate alibi witnesses.  Barnes' trial counsel and a defense investigator testified at the hearing, after which the judge denied any relief.

The judge considering Dennis's petition denied relief without an evidentiary hearing.  Both defendants appealed, and we consolidated the appeals for the purpose of issuing a single opinion.

## I.

Using our prior opinion, we summarize some of the trial evidence as necessary to address defendants' current arguments.

> Rasheen Glover lived with his wife, Latonya Glover, as well as Latonya's son and her two daughters, . . . age seven, and . . . age six . . . . At approximately 3:00 a.m. on May 5, 2005, Latonya woke up coughing and discovered that her house was on fire. The flames and smoke were so thick that she could not see down the hallway to her children's bedrooms. She broke a window in her bedroom . . . , rolled off a roof and fell

to the ground below. Looking up, she could see Rasheen still on the roof and then saw him run back into the house. Her son escaped from the burning house, but Rasheen, [and the children] died in the fire.
[Id. at 3.]

Subsequent investigation led the State's expert to opine the fire was "consistent with the delivery of an ignitable substance into the house by firebombing[.]" Id. at 3–4.

Ultimately, the police investigation turned to Barnes, who was a friend of Glover's cousin and "a foot soldier in the Bounty Hunter Bloods (BHB) street gang in Trenton." Id. at 5. Dennis was the "'head person' in the BHB," who "were 'supposed to be militant, no playing around, and . . . [were] supposed to keep the label as the most infamous Blood set.'" Ibid. (alteration in original). The gang put Barnes on "violation" and restricted his gang privileges when it became known Glover disrespected him and Barnes did nothing about it. Id. at 6.

Barnes intended to shoot Glover, but Dennis said "killing Glover would be the 'only way' Barnes would get off violation, and that Barnes had to burn down Glover's house" using a Molotov cocktail. Ibid. Barnes agreed, and co-defendant and fellow BHB leader Andre Thomas chose gang member Tyhir to serve as Barnes' driver. Ibid. Barnes and Tyhir parked near Glover's house early

A-0145-19

in the morning, and "each threw a Molotov cocktail through the front window." Ibid.

At trial, Thomas testified and confirmed Barnes' involvement in the triple murder, and "Tyhir reiterated a statement he had made to the police admitting his involvement in the triple murder." Id. at 7. "The State also proffered another witness, Tremayne Johnson, a 'foot soldier' in the BHB." Ibid. Barnes "asked Johnson to be the driver. Johnson refused, and after the firebombing, Johnson talked with Thomas, who stated that Barnes and Tyhir were responsible for the murders." Ibid. While Johnson and Tyhir were incarcerated together, Tyhir told Johnson of his role in the firebombing. Ibid.

Singleton, another member of the BHB, also testified at trial. Barnes told him he would get off violation by killing the guy who had disrespected him. Id. at 7–8. "Singleton lent his car to Tyhir so that he could go with Barnes to '[g]o kill the guy[.]'" Id. at 8 (alterations in original). Singleton said Dennis "called a meeting shortly after the murders, when he determined that Barnes 'was hot' and had to get out of town." Ibid.

Although not noted in our prior opinion, Barnes elected to testify at trial; Dennis did not. Barnes confirmed that he had a verbal dispute with Glover in public and that, as a result, Thomas put him on violation. Barnes further

confirmed he told Thomas he would "shoot the guy" to get off violation, but Thomas said "plans" had "changed," and he needed to "burn [Glover's] house down." Thereafter, Barnes' testimony deviated from the accounts given by Thomas and Tyhir. Barnes testified that he did not participate in the arson, but instead left town on a bus for Delaware. Barnes said he left sometime in April 2005, and on the night of the arson, he worked an overnight shift at a McDonald's restaurant in Delaware.

## II.

To establish a successful IAC claim, a defendant must meet the two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 687 (1984), and recognized by our Supreme Court in State v. Fritz, 105 N.J. 42, 58 (1987). A defendant must first show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Fritz, 105 N.J. at 52 (quoting Strickland, 466 U.S. at 687).

As to this prong, "there is 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[,]' [and t]o rebut that strong presumption, a defendant must establish that trial counsel's actions did not equate to 'sound trial strategy.'" State v. Castagna, 187 N.J. 293, 314 (2006) (quoting Strickland, 466 U.S. at 689). "In some cases, whether

A-0145-19

counsel's conduct is reasonable 'may be determined or substantially influenced by the defendant's own statements or actions.'" State v. Martini, 160 N.J. 248, 266 (1999) (quoting Strickland, 466 U.S. at 691). "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." Strickland, 466 U.S. at 691.

Additionally, a defendant must prove he suffered prejudice due to counsel's deficient performance. Id. at 687. A defendant must show by a "reasonable probability" that the deficient performance affected the outcome. Fritz, 105 N.J. at 58. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." State v. Pierre, 223 N.J. 560, 583 (2015) (quoting Strickland, 466 U.S. at 694; Fritz, 105 N.J. at 52). "[A] conviction is more readily attributable to deficiencies in defense counsel's performance when the State has a relatively weak case than when the State has presented overwhelming evidence of guilt." State v. Gideon, 244 N.J. 538, 557 (2021).

We defer to a "PCR court's factual findings, given its opportunity to hear live witness testimony, and '[an appellate court] will uphold the PCR court's findings that are supported by sufficient credible evidence in the record.'" Id. at 551 (quoting State v. Nash, 212 N.J. 518, 540 (2013)). However, an appellate

court "need not defer to a PCR court's interpretation of the law; a legal conclusion is reviewed de novo." Nash, 212 N.J. at 540–41 (citing State v. Harris, 181 N.J. 391, 415–16 (2004)).

Barnes' Appeal — A-0145-19

On November 2, 2006, prior to the start of trial and in accordance with Rule 3:12-2(a), Barnes' trial counsel sent the prosecutor a notice of alibi, attaching the names and addresses of five people, including Marjorie Barnes, Katisha Smalls, and Kim Blake. The letter stated, "It is expected . . . each will testify that [Barnes] came to Delaware in late April and stayed with his grandmother and then his cousin until he was arrested on unrelated charges in late May," and "each will testify that they saw [Barnes] in Delaware on or about the date and/or time of the incident."

A.

Barnes submitted four certifications from three potential witnesses in support of his PCR petition. Lawrence Barnes and Marjorie Barnes, in two separate but nearly identical certifications, stated that "[o]n May 5, 2005, at 3:00 A.M., Kelvin Barnes was living in . . . Delaware with Katisha Smalls," and "[h]e remained in . . . Delaware from March 2005 until he was arrested by the police and brought back to New Jersey."

Donald Powell, an investigator with the Office of the Public Defender (OPD), submitted two certifications. Powell had spoken with Kim Blake over the phone; Blake said, "Barnes would stay with her from time to time and on May 5, 2005, at 3:00 a.m., he was probably living with her at her home in . . . Delaware." Powell also spoke to Katisha Smalls, who told him that at the same date and time Barnes was inside her Delaware house. Powell's second certification asserted that he spoke to trial counsel who "indicated . . . that he failed to interview any witnesses with respect to a potential alibi defense and . . . did not generate any investigative reports."

The PCR judge reserved decision after hearing argument on the petition and subsequently ordered an evidentiary hearing limited to "whether [counsel]'s performance was objectively unreasonable in failing to elicit testimony from putative alibi witnesses." Trial counsel was the first witness at the evidentiary hearing, which took place before a different PCR judge.

Trial counsel, who was assigned the case through the OPD, recalled Barnes offered him names of witnesses to support an alibi defense and also recalled passing those names along to the State and the judge in the alibi notice. Counsel specifically recalled speaking to Marjorie Barnes and Smalls, but he determined the defense "just didn't work." Counsel concluded "the

9

overwhelming weight of the evidence as adduced at trial and as developed prior to trial was that this alibi was a ruse and that Mr. Barnes, in fact, did commit the crime and then subsequently tried to deport himself to Delaware as a cover."

Counsel was "very uncomfortable because the stories didn't seem to fit together," and he felt obligated both to "avoid suborning perjury" and "also not to put up a ridiculous defense" that would increase the likelihood of conviction. Counsel remembered Barnes testifying on direct examination that he had worked the overnight shift at McDonald's on the night of the fire, which was "factually inconsistent" with the accounts counsel received from the alibi witnesses, and he was unable to support either with independent evidence.

Counsel said his decision not to call the purported alibi witnesses was a "strategic decision." Counsel was "pretty sure" he "discussed the alibi stuff" with Barnes, and that he was uncomfortable calling Smalls and Marjorie Barnes in particular as witnesses because of his "discomfort with what [he] was getting" as support for the defense.

Counsel's examination of the file led him to believe he never hired an investigator on the case, and he recognized there were no notes documenting his conversations with the potential witnesses. But, counsel said he was "known throughout the region never to have a file, never to carry notes," and that, in the

A-0145-19

2,000 criminal cases and 50 criminal trials he handled over his 18-year career, he had a habit and "remarkable reputation" for "keep[ing] it all in [his] head." Counsel disputed Powell's certification, in which he said trial counsel admitted never speaking with any potential alibi witnesses. Counsel said his defense strategy was to shift blame from Barnes onto Dennis, but that "[t]here wasn't a lot to work with" given the strength of the State's case.

Powell, who was ill, testified telephonically on the second day of the evidentiary hearing, which occurred several months after the first day of the hearing. Powell reaffirmed that trial counsel said he "never heard of the names" of the potential alibi witnesses. He reiterated there were no investigative reports of interviews with these alibi witnesses in the trial file.

Defendant also intended to call Smalls to testify on the second day of the hearing, but she did not appear. PCR counsel said he was unable to subpoena her because she was a Delaware resident, and he detailed for the record his efforts to have her appear. Smalls confirmed with PCR counsel that she would appear, but did not, and she had not responded to PCR counsel's voice mails and text messages. PCR counsel also represented he did not intend to call Blake, another alibi witness referenced by Powell, because her testimony would not

11

"rise to a credible alibi defense especially in light of what . . . Smalls was able to say."

In a comprehensive written decision, the PCR judge found trial counsel testified in a truthful manner and was credible. The judge found Powell also testified truthfully, but he gave the investigator's testimony only slight weight because of its "derivative nature." The judge also noted Powell testified the words he attributed to trial counsel in his certification were not counsel's exact words, but rather were Powell's recollection of his interview documented six weeks later.

The judge concluded it was "readily apparent [trial counsel]'s decision to avoid submitting an alibi defense was not ineffective assistance of counsel, but was instead a wholly proper strategic decision." Because the judge found trial counsel's performance to be "plainly competent," he held Barnes had not met the first prong of the Strickland test. The judge found trial counsel had accurately determined the "tales" of Marjorie Barnes and Smalls were a "ruse," insofar as they were inconsistent with both the evidence counsel had reviewed during discovery and with Barnes' own trial testimony. Specifically, Smalls would have placed Barnes in her Delaware home at the time of the fire, but Barnes testified he was working an overnight shift at McDonald's that night.

The judge further found Barnes had "unilaterally chose[n] to testify, fully cognizant of the fact no material aspect of his testimony could be corroborated."

On appeal, Barnes argues the PCR judge erred because the record following the evidentiary hearing demonstrated trial counsel provided ineffective assistance by failing to investigate defendant's alibi and failing to move for a severance before trial. Barnes also argues PCR counsel provided ineffective assistance because he failed to subpoena Katisha Smalls for the evidentiary hearing, and the judge erred by not sua sponte issuing a subpoena for her appearance. We reject these arguments and affirm.

## B.

As to the alleged failure to adequately investigate or call an alibi witness to support his trial testimony, reduced to its essence Barnes' argument is that the judge should not have credited trial counsel's testimony that he spoke with two of the alibi witnesses, because that assertion was unsupported by any documents in the trial file. However, in considering a PCR judge's factual findings and credibility determinations after an evidentiary hearing, the Court has cautioned, "An appellate court's reading of a cold record is a pale substitute for a trial judge's assessment of the credibility of a witness he has observed firsthand." Nash, 212 N.J. at 540.

Assuming arguendo trial counsel failed to investigate potential alibi witnesses, including Smalls, that failure is clearly deficient performance and cannot support a conclusion that counsel exercised sound trial strategy. State v. Savage, 120 N.J. 594, 617–18 (1990). However, Barnes never produced a single witness at the evidentiary hearing or any other documentary evidence that supported the specifics of his Delaware alibi, i.e., he was working an overnight shift at McDonald's when the arson occurred. Therefore, Barnes failed to satisfy the second Strickland standard.

C.

Barnes also contends trial counsel provided ineffective assistance by not moving to sever his trial from Dennis's trial because evidence of Dennis's uncharged bad acts was improperly admitted pursuant to N.J.R.E. 404(b), and that evidence substantially prejudiced Barnes at their joint trial. The PCR judge considered and rejected this argument, noting Barnes raised the same claim on direct appeal. He further found our prior opinion specifically concluded the N.J.R.E. 404(b) evidence was properly admitted, and the trial judge's limiting instructions adequately defeated Barnes' claim of undue prejudice. Dennis and Barnes, at 19–28.

A-0145-19

As an initial matter, Barnes' claim is procedurally barred under Rule 3:22-5 having been previously adjudicated on the merits. "In assessing whether there has been a 'prior adjudication on the merits,'" for purposes of triggering this procedural bar, "the challenged claim should be compared with the prior claim to determine if the two claims 'are either identical or substantially equivalent.'" State v. Marshall, 173 N.J. 343, 351 (2002). "If the claims are substantially the same, the petition is procedurally barred." Ibid. The claim as now framed is substantially equivalent to the claim brought on direct appeal.

Moreover, it is unlikely a severance motion would have been successful. Rule 3:7-7 permits the State to charge two or more defendants in the same indictment and in the same counts within an indictment. A defendant seeking severance must demonstrate prejudice from a joint trial. R. 3:15-2. See State v. Brown, 118 N.J. 595, 605 (1990) ("[T]he quantum of real prejudice is critical in any determination to grant a severance."). As our opinion on Barnes' direct appeal demonstrated, even though the judge admitted N.J.R.E. 404(b) evidence about Dennis, Barnes suffered no prejudice from the joint trial. Trial counsel's failure to assert a losing argument does not demonstrate deficient performance. State v. Echols, 199 N.J. 344, 361 (2009).

D.

Barnes also argues a new evidentiary hearing is necessary because the PCR judge failed to sua sponte subpoena Smalls and compel her testimony at the hearing. Barnes claims the PCR court had the inherent authority to issue the subpoena pursuant to the Uniform Act to Secure the Attendance of Witnesses from Within or Without a State in Criminal Proceedings, N.J.S.A. 2A:81-18 to -23 (the Uniform Act).

The Uniform Act provides, in pertinent part:

> If a person in any state, which by its laws has made provision for commanding persons within its borders to attend and testify in criminal prosecutions, or grand jury investigations commenced or about to commence, in this state, is a material witness in a prosecution pending in a court of record in this state, or in a grand jury investigation which has commenced or is about to commence, a judge of such court may issue a certificate under the seal of the court stating these facts and specifying the number of days the witness will be required.
>
> [N.J.S.A. 2A:81-20.]

"To obtain the relief provided for in N.J.S. 2A:81-20, defendant ha[s] the burden of establishing that [Smalls] was a 'material witness.'" State v. Smith, 87 N.J. Super. 98, 103 (App. Div. 1965).

A-0145-19

In Smith, we said a defendant must establish "at the preliminary hearing upon his application, a showing that not only would [the witness] testify favorably in his behalf, but also that such testimony would be material to his defense." Ibid. (citing In re Cooper, 127 N.J.L. 312 (Sup. Ct. 1941)). In Smith, we held that "conclusory oral statements by [the] defendant's attorney" as to what the witness would say were insufficient. Id. at 104.

Here, defendant never suppled a certification from Smalls; only Powell's certification summarizing a phone conversation he had with Smalls. Moreover, Smalls told the investigator Barnes was in her home at the time of the fire, in stark contrast to defendant's testimony at trial that he was working at McDonald's. Smalls' purported testimony would not have been material to defendant's claims if it was contradictory. Therefore, even if defense counsel sought the court's intervention to compel Smalls' appearance at the evidentiary hearing, which did not occur, it is unlikely the record provided sufficient grounds to conclude Smalls was a material witness in the proceeding and the judge should have issued compulsory process.

E.

Barnes also contends PCR counsel was ineffective for failing to compel Smalls' appearance at the hearing. Logically, our rules set forth a different

17

procedure for bringing ineffective assistance of PCR counsel claims, requiring such claims be brought in a separate petition within one year of the denial of the first PCR petition. R. 3:22-12(a)(2)(C). Moreover, based on our immediate prior discussion, it is unlikely that based on the record before it, the PCR court would have issued a material witness complaint against Smalls. PCR counsel's failure to raise a losing argument during the proceeding does not equate to deficient performance. Echols, 199 N.J. at 361.

In A-0145-19, we affirm the denial of Barnes' PCR petition.

### Dennis's Appeal — A-2352-19

Dennis's first supplemental PCR petition asserted an IAC claim that trial counsel suffered from an inherent conflict of interest, and that Dennis was denied a fair trial because of juror misconduct. In a second supplemental petition, Dennis alleged he did not testify at trial due to trial counsel's lack of preparation, and trial counsel was ineffective for failing to secure Thomas's cell phone records. In a third supplemental certification, Dennis said he smelled alcohol on trial counsel's breath during court proceedings, and counsel admitted having "a few drinks" during lunch.

Dennis provided certifications from Raymond E. Troxell and Anil Nayee, both of whom trial counsel represented in Middlesex County. The certifications

were filed by Troxell and Nayee in support of their PCR petitions, and both averred trial counsel had alcohol on his breath during the proceedings in Middlesex County.

Dennis's mother, Shirley Middleton, provided a certification in support of the PCR petition. Middleton claimed Dennis's trial counsel was employed previously by the Middlesex County Prosecutor's Office at a time when that office was prosecuting Dennis for a drug offense. She brought her concerns over this "conflict of interest" to Vernon Clash, the Deputy Public Defender in the OPD's Mercer County Trial Region, but "no action" was taken.

Middleton also certified that during the trial she saw a juror speaking with an unidentified person outside the courthouse. She did "not recall what specifically the juror was sharing with this person," but the "juror was talking about [her] son's trial." Middleton brought it to trial counsel's attention.

Lastly, Middleton certified that during a "lunch break" at trial, she saw the trial judge and trial prosecutor together in a "restaurant in downtown Trenton." Middleton said she overheard the judge say to the prosecutor, "if this comes back to haunt us, we have a problem." Middleton claimed she told trial counsel of the conversation.

19

The PCR record included a 2005 memorandum to the trial file, in which trial counsel, who acknowledged his employment by the Middlesex County Prosecutor's Office at the time it was prosecuting Dennis for a drug offense, stated he would check with the OPD "as to whether or not they still deemed it advisable for [him] to handle this matter," and further he would "fully apprise [Dennis] of [his] prior background and . . . get a waiver if he still desires me to represent him."

In a later 2015 interview with a defense investigator, trial counsel stated he did not prosecute Dennis's Middlesex County case, fully advised Dennis of his prosecutorial background, and did not recall "any waiver being needed or signed to represent" Dennis. Dennis asserted he was never asked to waive what he contended was a disqualifying conflict of interest. Trial counsel also told the investigator he did not recall having any conversation with Middleton about her observations outside the courtroom, and he thought the report of a lunch meeting between the trial judge and trial prosecutor during trial was "very unlikely."

Dennis further claimed the OPD Mercer County Trial Region, which assigned the case to trial counsel, had an independent conflict of interest, i.e., LaTonya Glover was employed as a secretary in that office. In 2015, a defense investigator spoke with Clash, the Deputy in charge of the Region. He told the

investigator OPD protocol only required that a pool attorney represent Dennis, which is why the case was assigned out of the office to trial counsel.

The judge considering Dennis's PCR petition denied relief without an evidentiary hearing. We discuss below as necessary the judge's reasons expressed in an oral opinion supporting her December 16, 2019 order.

On appeal, Dennis raises several specific IAC claims, which we address below. He also argues the PCR judge erred by not granting his discovery motion seeking alleged exculpatory telephone records. In his pro se supplemental brief, Dennis also presents an IAC claim against PCR counsel.

A.

Dennis's IAC claims are: (1) both trial counsel and the OPD's Mercer County Trial Region had disqualifying conflicts of interest; (2) counsel failed to move to recuse the judge; (3) counsel failed to inform the judge of juror misconduct; (4) counsel abridged defendant's constitutional right to testify; (5) counsel consumed alcohol during the trial; and (6) counsel failed to peremptorily challenge a juror. In his pro se supplemental brief, Dennis further argues trial counsel was ineffective for failing to object to the State's improper religion-based juror challenge.

A-0145-19

(1)

Most of these claims do not require extensive discussion. The PCR judge concluded Middleton's assertion about juror misconduct lacked "corroborating evidence that it even occurred" or "what the conversation was about." The judge concluded "some vague assertion that a juror spoke to an unknown individual about a trial does not . . . rise to the level of having a reasonable probability that the result of the trial would have been different under Strickland." We agree.

Assuming Middleton's information was relayed to trial counsel, to justify an evidentiary hearing a "defendant 'must allege facts sufficient to demonstrate counsel's alleged substandard performance.'" State v. Jones, 219 N.J. 298, 312 (2014) (quoting Porter, 216 N.J. 343, 355 (2013)). Dennis has not made the required "strong representation that [he] may have been harmed by juror misconduct," necessary before a court should invoke the "extraordinary procedure" of permitting the questioning of a petit juror about deliberations. State v. Harris, 156 N.J. 122, 154 (1998) (quoting State v. Koedatich, 112 N.J. 225, 288 (1988)).

In his certification, Dennis claimed trial counsel persuaded him not to testify on his own behalf by telling him the jury would be told Dennis was a leader in the BHB and had a prior conviction from Middlesex County. He

22

asserted trial counsel failed to prepare him to testify. The PCR judge examined the trial record and concluded the trial judge discussed with Dennis his decision not to testify. She did not "find credible [Dennis]'s claims about . . . being deprived of his right to testify," and also found defendant failed to meet the second prong of the Strickland test, because he failed to explain what his testimony would have been if he had testified.

In State v. Ball, we affirmed denial of the defendant's PCR petition without an evidentiary hearing where the record showed that "regardless of whether defendant was advised by counsel" of his right to testify, "the trial judge fully explained" the right to defendant, along with "the possible consequences of his choice and the option to have the jury instructed to draw no inference from defendant's choice not to testify." 381 N.J. Super. 545, 557 (App. Div. 2005). The record in this case similarly belies Dennis's IAC claim in this regard.

Regarding counsel's consumption of alcohol during trial, the PCR judge held that "consumption of alcohol by an attorney is not in and of itself dispositive of an [IAC] claim," and found "no indication that trial counsel has ever admitted to having an alcohol problem or did have an alcohol problem or was ever reprimanded by the bar for alcohol use." As to prong two of Strickland, the judge found no prejudice, noting Dennis had not "point[ed] to a specific

instance where the counsel's performance during trial fell below the professional standard because of the alcohol consumption." We agree, and the argument requires no further discussion. R. 2:11-3(e)(2).

So, too, do Dennis's IAC claims based on trial counsel's failure to exercise a peremptory challenge, and trial counsel's failure to object to the prosecutor's use of a peremptory challenge. The trial judge excused the juror, despite trial counsel's decision not to exercise a peremptory strike; the juror never sat on the trial. Barnes' counsel objected to the prosecutor's use of a peremptory challenge to excuse a different juror based on race; the trial judge considered the prosecutor's reasons and concluded there was no misconduct. Dennis's belated argument that the prosecutor excused that juror on religious grounds lacks any support in the record.

(2)

Two of Dennis's IAC claims require additional discussion. First, in denying Dennis's claim that trial counsel had a disqualifying conflict of interest because he was previously employed by the Middlesex County Prosecutor's Office when it was prosecuting defendant, the judge held trial counsel's representation did not violate Rule of Professional Conduct 1.11, pertaining to conflicts of interest for former government attorneys. She also determined the

OPD's Mercer Trial Regional followed "the proper protocol," and while the OPD reserved some control over the representation, Dennis's petition "amount[ed] to nothing more than vague, conclusory and speculative allegations of prejudice."

On appeal, Dennis argues the PCR judge failed to consider the "lethal combination" of the two alleged conflicts had "a toxic 'potential impact'" on him. For example, Dennis alleged in his certification that trial counsel rejected his request to examine the phone records of co-defendant Thomas, telling Dennis "the Public Defender's Office does not finance that kind of investigation work."

When a petitioner has not established the prejudice prong, "the Sixth Amendment guarantee is generally not implicated. . . . There are, however, circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." United States v. Cronic, 466 U.S. 648, 658 (1984). In general, "only an extraordinary deprivation of the assistance of counsel triggers a presumption of prejudice." State v. Miller, 216 N.J. 40, 70 (2013) (citing Bell v. Cone, 535 U.S. 685, 695–96 (2002)).

Regarding attorney conflicts in criminal cases, "in the absence of waiver, if a potential conflict of interest exists, prejudice will be presumed resulting in a violation of the New Jersey constitutional provision guaranteeing the assistance of counsel." State v. Land, 73 N.J. 24, 35 (1977) (citing N.J. Const.,

art. I, ¶ 10); accord Fritz, 105 N.J. at 60 n.2.  Under our state's two-tiered approach to constitutional deprivation of counsel claims predicated on conflicts of interest, courts look first for a "per se conflict of interest," for which "prejudice is presumed in the absence of a valid waiver, and the reversal of a conviction is mandated."  State v. Cottle, 194 N.J. 449, 462, 467 (2008).  But, "[m]any such potential conflicts will not warrant a presumption of prejudice with the consequent automatic reversal of any criminal conviction suffered by the client."  State v. Drisco, 355 N.J. Super. 283, 294 (App. Div. 2002).

In In re Advisory Opinion of Professional Ethics No. 361, the Court held an assistant county prosecutor who goes into private practice "may not represent a defendant in any matter in which he participated while in the prosecutor's office . . . includ[ing] any aspect of investigation, trial preparation," or in any matter "for which he had any responsibility" or "had acquired any knowledge of any particular matter."  77 N.J. 199, 207 (1978) (emphasis added).  Trial counsel did not represent Dennis on the matter pending in Middlesex County, nor did that office prosecute Dennis for the homicides.  There was no per se conflict of interest, and Dennis failed to demonstrate actual prejudice resulting from the alleged conflict.

With respect to the OPD's alleged conflict, per statute, the OPD has authority "whenever needed . . . to provide independent counsel to multiple defendants whose interests may be in conflict." N.J.S.A. 2A:158A-9. That is the procedure the OPD ordinarily follows to resolve a conflict of interest, and it is the procedure the Supreme Court has directed should be "the norm." State v. Bell, 90 N.J. 163, 174 (1982). We reject Dennis's IAC claims based on trial counsel's or the OPD's alleged conflicts of interest.

(3)

We come to a troublesome issue — whether Dennis is entitled to an evidentiary hearing based on Middleton's assertion that she overheard a conversation between the trial judge and trial prosecutor, who were together during a lunch break in a Trenton restaurant, and she brought it to the attention of trial counsel who did nothing. The State failed to address the claim during oral argument before the PCR judge, and it fails to address the issue at all in its appellate brief.

In rejecting the claim, the PCR judge found Middleton's allegations were "uncorroborated," and the "lack of . . . evidence" did not satisfy the second Strickland prong. The judge further found there was "no showing . . . this alleged communication resulted in depriving [Dennis of] his right to a fair trial,"

27

because he failed to allege "the judge sided with the prosecutor at every instance" or "flaunted a relationship in front of the jury that he had with the prosecutor."

We recognize "[a]ppearances matter when justice is dispensed . . . [and] public perception that a judge might be partial to one party over another — whether true or not — cannot be reconciled with the ideal of blind justice." In re Advisory Letter No. 7-11 of the Sup. Ct. Advisory Comm., 213 N.J. 63, 66 (2013). To warrant disqualification of a judge, the Court has set out the following standard: "Would a reasonable, fully informed person have doubts about the judge's impartiality?" DeNike v. Cupo, 196 N.J. 502, 517 (2008).

Assuming arguendo the allegations in Middleton's certification were true, there may have been grounds to disqualify the trial judge. See, e.g., Code of Judicial Conduct, Canon 3, Rule 3.8 ("[A] judge shall not initiate or consider ex parte or other communications concerning a pending or impending proceeding."); Code of Judicial Conduct, Canon 3, Rule 3.17(B)(3)(d) ("Judges shall disqualify themselves in proceedings in which their impartiality or the appearance of their impartiality might reasonably be questioned, including . . . [if] . . . [t]he judge has a social relationship with a party or a lawyer for a party of a nature that would give rise to partiality or the appearance of partiality.").

A-0145-19

Furthermore, if Middleton brought the information to trial counsel's attention, he was obligated to raise the issue during trial, and his failure to do so amounts to deficient performance.

The PCR judge erred by placing any burden on Dennis to demonstrate actual prejudice. Retroactive disqualification of a judge presiding over a criminal trial warrants a reversal of the conviction and granting of a new trial without inquiry into prejudice. See, e.g., State v. Perez, 356 N.J. Super. 527, 532 (App. Div. 2003) (invalidating the defendant's conviction upon finding the judge should have recused himself due to comments about defendant's ethnicity "that a reasonable person would take as reflecting bias"); State v. Kettles, 345 N.J. Super. 466, 471 (App. Div. 2001) (reversing conviction upon finding the judge knew of disqualifying conflict of interest based on prior presentment of the defendant's case to grand jury); State v. Tucker, 264 N.J. Super. 549, 554–55 (App. Div. 1993) (reversing conviction where the trial judge, when an assistant prosecutor, presented two cases involving the defendant before a grand jury).

The sole issue, therefore, was whether the record before the PCR judge demonstrated a prima facie case warranting an evidentiary hearing. "A prima facie case is established when a defendant demonstrates 'a reasonable likelihood

that his or her claim, <u>viewing the facts alleged in the light most favorable to the defendant</u>, will ultimately succeed on the merits.'" <u>Porter</u>, 216 N.J. at 355 (quoting <u>R.</u> 3:22-10(b) (emphasis added)).

Here, the PCR judge found Middleton's certification was "uncorroborated," which implied it was not credible. As in <u>Porter</u>, "the court made credibility findings without hearing" any testimony. <u>Id.</u> at 356. Also, as in <u>Porter</u>, the State offered nothing to rebut the certification. <u>Ibid.</u>

Under these circumstances, we are compelled to remand the matter to the Law Division to conduct an evidentiary hearing on Middleton's claims regarding an ex parte luncheon meeting between the trial judge and trial prosecutor during trial, and, based upon the facts found at that hearing, whether Dennis demonstrated trial counsel's performance was rendered deficient by not raising the issue with the trial judge. We offer no opinion on the issue.

B.

Dennis sought post-conviction discovery in the form of co-defendant Thomas's cell phone records, arguing they would "disprove the alleged telephonic communications" between Dennis and Thomas. In rejecting the request, the PCR judge held this was not "the unusual case" in which "the right to . . . discovery . . . should be compelled." The judge noted that Dennis failed

to establish the State ever possessed the records. She reasoned even if the records did not show communications between Dennis's and Thomas's phone numbers, that was not dispositive as to whether they spoke to each other, because either, or both of them, could have borrowed a phone or used a "burner phone." Dennis reiterates the argument on appeal. We find it unpersuasive.

The Court recently addressed the issue:

> [P]ost-verdict discovery requests fall within the discretion of the trial court: As we held in [State v.] Marshall, a trial court's inherent power to order discovery extends to post-conviction proceedings "when justice so requires." 148 N.J. [89, 269 (1997)]. But courts invoke that discretion "only in the unusual case," id. at 269–70, in recognition of the importance of finality, id. at 152.
>
> [State v. Szemple, 247 N.J. 82, 97 (2021).]

"[W]here a defendant presents the PCR court with good cause to order the State to supply the defendant with discovery that is relevant to the defendant's case and not privileged, the court has the discretionary authority to grant relief." Id. at 107 (quoting Marshall, 148 N.J. at 270). "Though Marshall did not define good cause within the context of post-conviction discovery, other jurisdictions have observed 'that a showing of good cause entails more than "a generic demand for potentially exculpatory evidence."'" Ibid. (quoting Commonwealth v. Williams, 86 A.3d 771, 786 (Pa. 2014)).

Here, Dennis failed to show how the request for discovery was "a means for vindicating actual claims," and the PCR court acted properly within its discretion in denying the request for post-conviction discovery. Marshall, 148 N.J. at 270.

To the extent we have not otherwise addressed additional arguments raised by Dennis, they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed in part; remanded in part for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION