**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3383-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

BRANDON G. DIXON,

    Defendant-Appellant.

_____

Submitted May 8, 2025 – Decided May 14, 2025

Before Judges Mawla, Natali, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 13-11-1560.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (John J. Bannan, Designated Counsel, on the brief).

LaChia L. Bradshaw, Burlington County Prosecutor, attorney for respondent (Nicole Handy, Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Brandon Dixon appeals from a May 15, 2023 order denying his petition for post-conviction relief (PCR). We affirm.

A jury convicted defendant of murdering Charles Bauer during a robbery defendant had planned with his co-defendant, Ryan J. Sweet. In a prior appeal, we affirmed defendant's convictions on: first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); first-degree armed robbery, N.J.S.A. 2C:15-1(a)(1) and (2); and second-degree desecration of human remains, N.J.S.A. 2C:22-1(a)(1). State v. Dixon, No. A-2852-16 (App. Div. Mar. 15, 2019) (slip op. at 17). Except for remanding for a restitution hearing, we also affirmed defendant's aggregate sentence to a life term subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. Ibid. Our Supreme Court denied defendant's petition for certification. State v. Dixon, 239 N.J. 397 (2019).

At trial, the State presented testimony from the Burlington County Medical Examiner. The medical examiner explained, while the victim had few outward signs of trauma, he observed "tiny dot-like hemorrhages," referred to as "petechiae," "in the skin of his eyelids and . . . over the very fine facial skin." He explained an abundance of these would indicate that an individual had "been gripped around the neck and strangled," but the victim did not show any other

signs of having been strangled, although he had "some other features internally that . . . suggest[ed] that at least he was partly asphyxiated." The medical examiner was unable to determine whether the spots were due to strangulation or if they had "accumulated postmortem."

The medical examiner described the victim's heart as a "perfectly normal appropriate heart for a robust [twenty-three-year-old] person," but noted his lungs were filled with fluid, indicating pulmonary edema, consistent with a heart slowing down and stopping, as opposed to cardiac arrest. The victim's other internal organs were unremarkable. However, an examination of his brain revealed a dark discoloration, which suggested asphyxia and indicated he may have died from "poor oxygen delivery to his brain."

The prosecutor posed a hypothetical to the medical examiner about whether a sleeper-hold maneuver could be performed on an individual without leaving any outward signs. The medical examiner confirmed this was possible. On cross-examination, defense counsel presented a hypothetical and asked if a person being choked would exhibit defensive wounds such as scratches on the neck and DNA under their nails from resisting an attacker. The medical examiner responded this was very likely. We concluded "[t]he only explanation

A-3383-22

for the death was that the victim was put in a 'sleeper hold.'" Dixon, slip op. at 2.

The State adduced fact testimony from Sweet and the other co-defendants, including Sweet's mother, her paramour Patrick N. Bush, and Andrew J. Baith. Id. at 3-5. The evidence showed defendant and Sweet, who at the time of the murder had a broken leg, lured the victim to his death by pretending over text message to be Sweet's girlfriend and inviting the victim to visit the girlfriend. Id. at 3-4. The girlfriend had previously complained the victim would not stop contacting her, so Sweet developed a plan to have him come to his home believing he was rendezvousing with the girlfriend. Id. at 3.

Sweet needed defendant to handle the victim because of his broken leg. Baith testified he overheard the pair "planning to rob the victim, and saw defendant leave Sweet's home with a chain wrapped around his hand. Sweet stayed behind." Id. at 4.

When defendant returned home, Baith "overheard defendant tell Sweet that 'something went wrong' and 'the guy got hurt bad.' Defendant then told Baith that a man had died . . . ." Ibid. Sweet then told Baith defendant had killed the victim by putting him in a choke hold. Ibid. "Baith . . . testified that

defendant told him he had trained in mixed martial arts and 'almost went . . . professional.'" Ibid. (second omission in original).

Baith and defendant broke the victim's car windows to get inside the vehicle. Ibid. The evidence showed defendant removed the victim's identification and destroyed the victim's phone. Id. at 4-5. They then attempted to dispose of the car by setting it on fire but were unsuccessful. Id. at 5.

Bush also testified that the following morning defendant told him he "put the victim in a choke hold and put him to sleep." Ibid. When Bush continued to press defendant about what happened, defendant threatened "that if he mentioned the incident to anyone, he would be 'next.'" Ibid.

Police located the victim's body, his vehicle, and identified the men who were seen near the victim's car. Ibid. They found and arrested defendant in Pennsylvania where he had been hiding underneath his girlfriend's dormitory bed. Ibid.

At trial, defendant claimed Sweet was the killer because he was also trained in martial arts. Id. at 6. The defense asserted Sweet had lied about the broken leg and "extensively attacked the credibility of all the witnesses against defendant, all of whom had strong ties to Sweet but not defendant." Ibid.

At trial, Dianne Spriggs, who lived in defendant and Sweet's neighborhood, testified she heard a commotion and dogs barking as she was getting out of her vehicle to enter her home on the night of the incident. She walked up the street and saw a White male with a scar on the side of his face appear from the side of a vehicle parked in a driveway in front of a house. She returned home and got into her vehicle to get a better look at the house and the vehicle with her car's headlights. Spriggs then saw two other individuals appear out of the dark as she was driving past, and from her rear-view mirror, saw all three meet in the middle of the street. She described the two individuals who emerged from the dark as a younger-looking individual and "Mr. Dixon."

Spriggs then saw the three individuals get into a green Ford Explorer, which appeared to be waiting for them. She called 9-1-1 to report suspicious activity and told the dispatcher there were five individuals in the Explorer—two who were already in the driver and passenger seat, joined by the three individuals. In her statement to police, she identified the first individual she saw as a White male with dark-colored clothing and a scar on the right side of his face. She then described another individual, also White, who appeared to be around the age of sixteen or seventeen. Spriggs did not tell police she saw defendant and did not provide a description of him.

A-3383-22

On cross-examination, defense counsel asked Spriggs again to provide a description of the individuals she saw that evening. She responded that she saw two White males, one with a scar and one who was younger, about sixteen to seventeen, and a man who was "dark in color" with an afro. Defendant was the only Black defendant. Defense counsel then asked Spriggs to review her police statement, in which she had only identified two "[W]hite males, young teens" and asked if she had indicated to police that she saw an individual with an afro. Spriggs testified that she had, but not in the police statement. She explained the police had come to her the following day and shown her photos of a green vehicle and several individuals. It was at this point that she identified the driver and the vehicle from several photos police presented to her.

The trial judge held a sidebar, wherein defense counsel stated this was the first time the defense had learned there had been a photo array. The prosecutor also noted this was the first time he heard that Spriggs had identified defendant. The judge granted the State's request for an N.J.R.E. 104 hearing.

At the Rule 104 hearing, Spriggs testified that police showed her five to six photographs of several White individuals. She explained that she did not make an identification of defendant. Further, she had not told police she saw defendant because the police were focused on the individuals she saw in the

7

driveway and the driver of the Explorer. Approximately a month after her initial meeting with police, Spriggs saw a photo of defendant in the newspaper and recalled that he was one of the individuals she saw the night of the incident. However, she did not inform anyone at the time. Spriggs also mentioned she had seen defendant at the Burlington County Jail, where she worked as a corrections officer. When defense counsel asked her whether the trial was the first time she discussed remembering defendant from the night of the incident, she stated she had discussed it with the prosecutor during trial preparation. The trial judge permitted Spriggs to resume her trial testimony and directed her not to say she saw defendant at the Burlington County Jail.

Spriggs' trial testimony mirrored her testimony from the Rule 104 hearing. As to her identification of defendant during trial preparation, she stated she informed prosecutors she had seen defendant the night of the incident but could not recall when she gave them this information. She estimated it was within the week before the trial.

In the prior appeal, among other points, defendant raised the following as his first point on appeal:

> IT WAS REVERSIBLE ERROR TO HAVE FAILED TO CHARGE AGGRAVATED AND RECKLESS MANSLAUGHTER, WHICH WERE CLEARLY INDICATED BY THE RECORD. MOREOVER, THIS

FAILURE WAS EXACERBATED BY A FAULTY ACCOMPLICE LIABILITY CHARGE THAT OBLITERATED THE CRUCIAL DISTINCTION BETWEEN THE MENS REA OF THE PRINCIPAL AND THE MENS REA OF THE ACCOMPLICE.

[Id. at 6-7.]

We rejected the argument and, at the outset, noted the defense neither objected to the jury charge nor raised this issue at trial. Id. at 8. This was because

> [t]he defense theory at trial was that defendant was not present, and that Sweet, not he, was the perpetrator. Given this theory, it was a matter of strategy for counsel to have not requested the lesser-included offenses be charged, not objected to the accomplice charge, and not objected to the absence of any charges with regard to affirmative defenses to felony murder, or on self-defense. If those instructions had been given, it would signal to the jurors that the judge, at least, did not give credence to defendant's theory, and was therefore charging them about alternative scenarios plausible only if defendant was present at the scene of the victim's killing.
>
> [Id. at 8-9.]

Defendant subsequently filed his PCR petition, which was considered by Judge Mark P. Tarantino. He argued ineffective assistance of trial and appellate counsel and claimed he was denied the due process right to a fair trial.

9

Defendant based the ineffective assistance claims on the assertion that the medical examiner's testimony was not sufficient to permit the jury to conclude the examiner's opinion was based on a reasonable degree of medical certainty. He claimed counsel was ineffective for failing to object to the medical examiner's testimony regarding death by way of a sleeper hold. Defendant maintained counsel was also ineffective for failing to adduce expert testimony to undermine the medical examiner's conclusion by showing the examiner did not obtain tissue samples for histological examination and releasing the defense medical expert from testifying.

Defendant predicated the due process claims on his belief the State had failed to provide discovery related to Spriggs' identification. He further argued counsel was ineffective for failing to seek a Wade[1] hearing. Defendant reiterated counsel's alleged error for not seeking an aggravated manslaughter and reckless manslaughter jury instruction. He claimed the cumulative errors warranted granting his petition.

Judge Tarantino issued a detailed written opinion and concluded defendant had neither demonstrated counsel's representation was constitutionally deficient nor that any of counsel's errors would have changed

_____

[1] United States v. Wade, 388 U.S. 219 (1967).

the outcome of the case. Although defendant's argument of whether the medical examiner's testimony met the medical degree of sufficiency was a direct appeal issue and not a PCR issue, the judge nonetheless addressed it. The judge analyzed the record and noted trial counsel had raised "[v]arious objections" to the examiner's testimony and "was able to limit the scope of that testimony." Defense counsel had succeeded in barring the examiner from opining on the cause of death and limited his testimony to answering only a hypothetical question regarding a sleeper hold. The hypothetical was permissible as Bush had testified defendant told him he placed the victim in a sleeper hold. The judge concluded "[t]he fact that defendant is unhappy with the [trial judge's] rulings concerning the medical testimony" was not a basis to find ineffective assistance of trial counsel.

Moreover, "[h]aving the sleeper hold testimony in evidence was helpful to connect Sweet to the murder" because trial counsel's defense strategy was to show Sweet was the killer. The judge observed "[t]his defense makes sense because there was no direct witness to the murder, and Sweet was trained and experienced in martial arts." The fact there was evidence in the record showing the sleeper hold could cause asphyxiation was relevant because "[t]his was

11

something that Sweet would know about, given his . . . training." The judge also noted we addressed this issue on appeal.

Defendant's PCR counsel retained an expert who assessed the medical examiner's autopsy and critiqued it for not examining the victim's tissue samples to confirm whether the cause of death was by asphyxiation. The judge found this was not evidence of ineffective assistance of counsel because the expert's "medical opinion [was] based on a limited review of the autopsy report and the trial record itself. The report lacks specificity and offers possible causes of death such as by pneumonia or inflammation of the heart muscle, that could be true about this victim or many other deceased persons." Moreover, the medical examiner had opined the victim had a normal heart and "there was absolutely no suggestion or indication that the victim died of sudden pneumonia or heart or lung failure."

The judge noted the medical examiner did not offer an opinion as to cause of death and defendant's "after the fact medical report is even more uncertain[] and just presents possibilities." Defendant's expert report would not be dispositive because "[n]othing in the record suggest the other possible causes of death mentioned in this new report. The reasonable defense trial strategy focused on Sweet supplying the sleeper hold, not . . . defendant."

12

The judge found trial counsel acted reasonably to release the medical defense expert, who was expected to testify at trial, after counsel succeeded in barring the medical examiner from opining about the cause of death. The defense trial expert had concluded the cause of death should have been declared as undetermined. The judge concluded it was no longer necessary for counsel to call the expert because "counsel was aware that some of [the expert's] views were consistent with" the medical examiner's and "could have resulted in bolstering the State's case."

The judge found defendant was not deprived of a fair trial on account of the testimony the State adduced from Spriggs because "[t]rial counsel [had] thoroughly challenged [her] testimony on cross-examination . . . [and s]he was able to explain the reasons [for] her initial statement to investigators." Although after the Rule 104 hearing the prosecutor revealed Spriggs had twice met with the prosecution and said she saw defendant the night of the incident, this was not evidence trial counsel was ineffective. There was "no indication that the State hid or withheld evidence." The defense already knew what Spriggs said because the prosecution disclosed it "and that information was used by trial counsel to cast doubts on Spriggs' veracity and credibility." Moreover, the judge found if Spriggs' identification had been suppressed it would not have affected

the outcome because "[o]ther witnesses who already knew defendant testified about his involvement and presence at the scene. Defendant himself confirmed that he was there."

Defendant claimed trial counsel was ineffective for failing to seek a Wade hearing because Spriggs told investigators the people she saw the night of the incident were White and he is Black. The judge found the Rule 104 hearing was the appropriate response to the issue because once Spriggs testified and identified defendant at trial, defense "counsel immediately and properly objected." The Wade issue was irrelevant because "[d]efendant never denied being at the scene[, and] Spriggs observed persons there from a distance in the dark. She also explained her identification of . . . defendant at trial, stating that she subsequently saw his photo in the newspaper, and also saw him in the jail where she works." The judge noted "[o]ther witnesses testified credibly to defendant's presence at the scene."

Defendant did not demonstrate Spriggs' "out-of-court identification was overly suggestive such that [she] could have been led to misidentify" him. "Spriggs was not prompted to identify the person in the newspaper photograph as someone who was involved in the murder. She made this connection on her

own.  Seeing . . . defendant again in the course of her employment also did not taint the initial identification or make it overly suggestive."

The judge found even if a <u>Wade</u> hearing was held, Spriggs' out-of-court identification would have been admissible.  This was because "Spriggs personally observed the people at the scene of the crime during the time frame in which the crime was committed."  Although there were discrepancies in Spriggs' description and defendant's actual appearance, "Spriggs acknowledged at trial that her statement left out certain identifying information . . . such as [defendant's] afro."  In addition, "Spriggs did not have the opportunity to affirmatively identify . . . defendant prior to seeing the photograph array. . . . [S]he was unable to identify . . . defendant in the photographs police provided to her."  And "[s]he was initially able to identify defendant on her own when she read a newspaper article featuring his picture a month later."  The judge concluded "a full <u>Wade</u> hearing was unnecessary to determine the reliability of Spriggs' out-of-court identification."

The judge found defendant's argument regarding counsel's failure to seek an aggravated manslaughter and reckless manslaughter instruction was barred by <u>Rule</u> 3:22-4(b) because we had rejected the argument in the prior appeal.  As to appellate counsel, there was no showing "counsel failed to raise an issue that

would have resulted [in] a finding of reversible error on appeal. To the contrary, appellate counsel appealed any and all matters that could have legitimately been raised."

Defendant filed supplemental pro se briefs as part of his PCR petition, which the judge found had "little or no merit." Those submissions alleged "racial discrimination, lack of discovery, and surprises for him at trial." The judge rejected these claims because they were unsupported and unconnected to "his arguments [of] inadequacy of trial or appellate counsel." Moreover, defendant failed to raise those issues at trial or on appeal. The judge rejected defendant's claim of cumulative error and concluded defendant received "good trial representation and vigorous appeal."

The judge denied defendant's request for an evidentiary hearing because there were no issues raised that could not be resolved on the existing record. Defendant's claims were not supported by "other evidence outside of bald assertions and general disagreement with the way in which trial counsel handled his case."

Defendant raises the following points in his counseled brief:

POINT I

DEFENDANT'S CLAIMS ARE NOT PROCEDURALLY BARRED FROM BEING RAISED IN THIS PETITION FOR [PCR].

. . . .

POINT II

DEFENDANT'S LIFE SENTENCE WAS ILLEGAL (NOT RAISED BELOW).

POINT III

BECAUSE DEFENDANT WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL, THE PCR COURT ERRED IN DENYING DEFENDANT'S PETITION FOR PCR . . . .

POINT IV

BECAUSE DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL, THE PCR COURT ERRED IN DENYING DEFENDANT'S PETITION FOR PCR.

(A) Defense Counsel was Ineffective for Failing to Object to [the Medical Examiner's] Testimony Regarding Death by Sleeper Hold.

(B) Defense Counsel was Ineffective in Releasing [the Defense Medical Expert] from Testifying.

(C) Defense Counsel was Ineffective for Failing to Obtain Expert Testimony that [the Medical Examiner] Failed to Recover and Examine Tissue

17

Samples for Histologic Examination under a Microscope.

(D) Defense Counsel was Ineffective for Failing to Request a <u>Wade</u> or <u>Chen</u>[2] Hearing.

(E) Defense Counsel was Ineffective for Failing to Request an Aggravated and Reckless Manslaughter Charge.

(F) Defense Counsel was Ineffective in Light of the Cumulative Effect of Errors by Trial and Appellate Counsel.

POINT V

DEFENDANT WAS DENIED A FAIR TRIAL AND THE RIGHT TO CONFRONT WITNESSES AGAINST HIM WHEN THE STATE FAILED TO PROVIDE THE DEFENSE WITH ESSENTIAL DISCOVERY.

POINT VI

IN THE ALTERNATIVE, BECAUSE THERE ARE GENUINE ISSUES OF MATERIAL FACT IN DISPUTE, THE PCR COURT ERRED IN DENYING AN EVIDENTIARY HEARING.

Defendant's pro se brief raises the following points:

POINT I

[THE PCR JUDGE] MADE AN ERROR IN HIS DECISION TO LIMIT THE [PCR] PROCEDINGS TO STRICKLY INEFFECTIVE ASSISTANCE OF

---

2  <u>State v. Chen</u>, 208 N.J. 307 (2011).

COUNSEL[,] WHICH VIOLATED . . . DEFENDANT'S DUE PROCESS AND RIGHT TO A FAIR TRIAL. [RULE] . . . 3:22-2 . . . (A)(B)(C) & (D) WERE NOT TAKEN INTO CONSIDERATION.

POINT II

[RULE] . . . 3:22-4(A)(2) EXCEPTIONS TO BAR ENFORCEMENT OF THE BAR TO PRECLUDE CLAIMS, INCLUDING ONE FOR [INEFFECTIVE] ASSISTANCE OF COUNSEL, WOULD RESULT IN [FUNDAMENTAL] INJUSTICE . . . .

> (A) INEFFECTIVE ASSISTANCE OF COUNSEL VIOLATED . . . DEFENDANT'S DUE PROCESS BY NOT HIRING AN INVESTIGATOR AND MISSING KEY EVIDENCE THAT WOULD ENABLE HIM TO OBJECT AND NOT ALLOW THE PROSECUTION TO PRESENT FALSE EVIDENCE AT TRIAL[,] WHICH TAINTED THE JURORS AND HELPED LEAD THEM TO A GUILTY VERDICT. NOT HIRING THE EXPERT OPINION ON [PENNSYLVANIA] WARRANTS AND INVESTIGATIONS.

> (B) THE LAW ENFORCEMENT OFFICERS MISUSED THEIR [AUTHORITY] AND KIDNAPPED . . . DEFENDANT.

I.

"Post-conviction relief is New Jersey's analogue to the federal writ of habeas corpus." State v. Goodwin, 173 N.J. 583, 593 (2002) (quoting State v.

Preciose, 129 N.J. 451, 459 (1992)).  The process affords an adjudged criminal defendant a "last chance to challenge the fairness and reliability of a criminal verdict."  State v. Nash, 212 N.J. 518, 540 (2013) (internal quotations and citations omitted); see also R. 3:22-1.  "Post-conviction relief is neither a substitute for direct appeal, R[ule] 3:22-3, nor an opportunity to relitigate cases already decided on the merits, R[ule] 3:22-5."  Preciose, 129 N.J. at 459; see also State v. Echols, 199 N.J. 344, 357 (2009).

> Consequently, petitioners may be procedurally barred from post-conviction relief under Rule 3:22-4 if they could have, but did not, raise the claim in a prior proceeding, unless they satisfy one of the following exceptions:
>
> > (a) that the ground for relief not previously asserted could not reasonably have been raised in any prior proceeding; or (b) that enforcement of the bar would result in fundamental injustice; or (c) that denial of relief would be contrary to the Constitution of the United States or the State of New Jersey.
>
> [Preciose, 129 N.J. at 459.]

Beyond the procedural bar, to establish ineffective assistance of counsel, a defendant must satisfy the two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 687 (1984), and adopted by our Supreme Court in State v. Fritz, 105 N.J. 42, 58 (1987).  They must show:  (1) "counsel's

20

performance was deficient[,]" which requires defendant to prove "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) "the deficient performance prejudiced the" defendant because "counsel's errors were so serious as to deprive . . . defendant of a fair trial." Fritz, 105 N.J. at 52 (quoting Strickland, 466 U.S. at 687).

The Strickland standard applies on appeal as well, but "appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by the defendant." State v. Morrison, 215 N.J. Super. 540, 549 (App. Div. 1987) (citing Jones v. Barnes, 463 U.S. 745 (1983)). Appellate counsel will not be found ineffective for failure to raise a meritless issue or errors an appellate court would deem harmless. See Echols, 199 N.J. at 361. We review decisions of a PCR court under a de novo standard, where the court has not conducted an evidentiary hearing. State v. Harris, 181 N.J. 391 421 (2004).

## II.

Pursuant to these legal principles and having reviewed the record, we conclude the arguments raised in points III through VI of defendant's counseled brief and points I and II of his pro se brief lack sufficient merit to warrant discussion in written opinion. R. 2:11-3(e)(2). We affirm substantially for the

reasons expressed in Judge Tarantino's thorough and well-written opinion and add the following comments.

In point V of his counseled brief, defendant claims he was deprived of a fair trial since the State withheld discovery because it did not provide him with a report regarding Spriggs' interviews with the prosecutor's office and the out-of-court photo identification procedure. We are unpersuaded.

The seminal case of Brady v. Maryland, held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). To establish a Brady violation, "(1) the evidence at issue must be favorable to the accused, either as exculpatory or impeachment evidence; (2) the State must have suppressed the evidence, either purposely or inadvertently; and (3) the evidence must be material to the defendant's case." State v. Nelson, 155 N.J. 487, 497 (1998). The "evidence is material if there is a 'reasonable probability' that timely production of the withheld evidence would have led to a different result at trial." Id. at 520 (citing United States v. Bagley, 473 U.S. 667, 682 (1985)). Only when these three elements are present do they indicate a

violation of defendant's constitutional due process right to a fair trial. Id. at 518 (citing Brady, 373 U.S. at 87).

In accordance with these principles, Rule 3:13-3(b) requires that certain material be furnished to the defense. State v. Richardson, 452 N.J. Super. 124, 132 (App. Div. 2017). "The disclosure obligation pertains to 'relevant material . . . .'" Ibid. (quoting R. 3:13-3(b)(1)). "[R]elevant material" is defined as evidence that has "a tendency in reason to prove or disprove [a] fact of consequence to the determination of the action." Ibid. (second alteration in original) (quoting State v. Gilchrist, 381 N.J. Super. 138, 146 (App. Div. 2005)).

The failure to disclose Spriggs' identification of Sweet in the photo array was not material. The disclosure did not undermine defendant's theory of the case since his theory was that Sweet was the perpetrator. At best, Spriggs' identification of Sweet suggested Sweet's involvement, but it did not negate defendant's participation in the crime, which was substantiated by ample evidence placing him at the scene.

Spriggs' identification of defendant during trial preparation also was not material to the outcome. She testified that she identified defendant in a second interview with the prosecution approximately a week before trial, which showed the State itself did not have access to the information until shortly before trial.

23

Indeed, before the Rule 104 hearing, the prosecutor advised that it was his first time learning Spriggs had identified the defendant. Aside from the fact the record is devoid of evidence of the State withholding this information, the defense was not disadvantaged because Spriggs was cross-examined about the inconsistencies in her testimony. Even if the State had provided this information, it would not have changed the outcome given the substantial evidence implicating defendant. Apart from the failed disclosure, defendant does not otherwise explain how he would have used the information had it been provided earlier.

## III.

We need not address the argument raised in point I of defendant's counseled brief at length. Other than the argument related to the alleged failure to seek an aggravated and reckless manslaughter charge, which we rejected and the judge found was procedurally barred by Rule 3:22-5, the judge did not otherwise deny defendant's petition as being time barred.

## IV.

In point II of his counseled brief, defendant argues his life sentence was illegal. Defendant did not raise this issue in his PCR petition. However, "[a] truly illegal sentence can be corrected at any time." State v. Zuber, 442 N.J.

Super. 611, 617 (App. Div. 2015), rev'd on other grounds, 227 N.J. 422 (2017) (quoting State v. Acevedo, 250 N.J. 40, 47 n.4 (2011)).

An illegal sentence is one that either violates the Constitution or exceeds the authority granted by the Code of Criminal Justice. State v. Hawkins, 461 N.J. Super. 556, 561 (App. Div. 2019) (citing State v. Hyland, 238 N.J. 135, 143 (2019); R. 3:21-10(b)(5)). Our Supreme Court has defined "an illegal sentence [as] one that 'exceeds the maximum penalty provided in the Code for a particular offense' or a sentence 'not imposed in accordance with law.'" Acevedo, 205 N.J. at 45 (citing State v. Murray, 162 N.J. 240, 247 (2000)). Rule 3:22-2(c) authorizes PCR for the same reasons.

However, the "mere excessiveness of sentence otherwise within authorized limits, as distinct from illegality by reason of being beyond or not in accordance with legal authorization, is not an appropriate ground of [PCR] and can only be raised on direct appeal from the conviction." Id. at 45-46 (citing State v. Clark, 65 N.J. 426, 436-37 (1974)). Whether a defendant's sentence is illegal is an issue of law subject to de novo review. See State v. Drake, 444 N.J. Super. 265, 271 (App. Div. 2016).

Defendant argues he is entitled to PCR under Rule 3:22-2(c) because pursuant to N.J.S.A. 2C:43-7.1(b), a life sentence is not mandatory for murder.

25

He claims the sentencing judge did not consider the sentencing range proposed by the defense and the State. Instead, the judge imposed a life sentence based on his mistaken belief that it was required by N.J.S.A. 2C:43-7.1(b). Defendant contends his sentence should also be vacated because trial and appellate counsel failed to challenge this error.

In defendant's prior appeal he raised the following point as one of three challenges to his sentence:

> DEFENDANT MUST BE RESENTENCED TO AN ORDINARY TERM OF IMPRISONMENT BECAUSE THE STATE'S MOTION FOR A "THREE STRIKES" EXTENDED TERM WAS NOT FILED WITHIN FOURTEEN DAYS OF THE JURY'S VERDICT AS REQUIRED BY RULE 3:21-4(f), AND THE SENTENCING COURT DID NOT FIND GOOD CAUSE TO EXCUSE THAT FAILURE.
>
> [Dixon, slip. op. at 8.]

We rejected this argument, noting "[d]efendant was put on notice more than one month prior to sentencing that the court was considering the three strikes sentence." Id. at 15. The sentencing judge became aware the mandatory statute was applicable when he reviewed the presentencing report and defendant's prior conviction history. Ibid. The judge advised the parties "in ample time before the sentence, of the relevance of the extended-term statute. " Ibid.

26

We concluded as follows:

> The statute states that a person shall be sentenced to an extended term of imprisonment pursuant to N.J.S.A. 2C:43-7 if convicted of a violent crime on a third occasion. N.J.S.A. 2C:43-7.1(b). That is precisely what occurred in this case. The judge imposed life imprisonment upon defendant as a third-time offender. Subsection (b) requires an extended term for a person who has been convicted of felony murder, and has previously been convicted of robbery [in 2005] and aggravated assault [in 2007] as enumerated in the relevant statutory sections. The provision is mandatory. Defendant had ample time in which to prepare opposition. Thus, we find no error on the part of the court.
>
> [Id. at 16.]

Defendant's convictions for the murder here combined with his prior convictions for similarly substantial offenses in 2005 and 2007, clearly met the criteria for an extended term under N.J.S.A. 2C:43-7.1(b)(1). His sentence was not illegal because it fell within the range permitted by N.J.S.A. 2C:43-7. Defendant's sentencing issues have already been adjudicated. We decline to revisit them. See State v. Marshall, 173 N.J. 343, 351 (2002).

V.

Finally, to the extent we have not addressed an argument raised on appeal it is because it lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M. C. Harley*

Clerk of the Appellate Division

A-3383-22